(Slip Opinion)          OCTOBER  TERM,  2008          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MONTEJO *v.* LOUISIANA

### CERTIORARI TO THE SUPREME COURT OF LOUISIANA

No. 07–1529.   Argued January 13, 2009—Decided May 26, 2009

At a preliminary hearing required by Louisiana law, petitioner Montejo
was charged with first-degree murder, and the court ordered the ap-
pointment of counsel.  Later that day, the police read Montejo his
rights under *Miranda* v. *Arizona*, 384 U. S. 436, and he agreed to go
along on a trip to locate the murder weapon.  During the excursion,
he wrote an inculpatory letter of apology to the victim's widow.  Upon
returning, he finally met his court-appointed attorney.  At trial, his
letter was admitted over defense objection, and he was convicted and
sentenced to death.  Affirming, the State Supreme Court rejected his
claim that the letter should have been suppressed under the rule of
*Michigan* v. *Jackson*, 475 U. S. 625, which forbids police to initiate
interrogation of a criminal defendant once he has invoked his right to
counsel at an arraignment or similar proceeding.  The court reasoned
that *Jackson*'s prophylactic protection is not triggered unless the de-
fendant has actually requested a lawyer or has otherwise asserted
his Sixth Amendment right to counsel; and that, since Montejo stood
mute at his hearing while the judge ordered the appointment of
counsel, he had made no such request or assertion.

*Held:*
   1. *Michigan* v. *Jackson* should be and now is overruled.  Pp. 3–18.
      (a) The State Supreme Court's interpretation of *Jackson* would
lead to practical problems.  Requiring an initial "invocation" of the
right to counsel in order to trigger the *Jackson* presumption, as the
court below did, might work in States that require an indigent defen-
dant formally to request counsel before an appointment is made, but
not in more than half the States, which appoint counsel without re-
quest from the defendant.  Pp. 3–6.
      (b) On the other hand, Montejo's solution is untenable as a theo-
retical and doctrinal matter.  Eliminating the invocation requirement

entirely would depart fundamentally from the rationale of *Jackson,* whose presumption was created by analogy to a similar prophylactic rule established in *Edwards* v. *Arizona*, 451 U. S. 477, to protect the Fifth Amendment-based *Miranda* right. Both *Edwards* and *Jackson* are meant to prevent police from badgering defendants into changing their minds about the right to counsel once they have invoked it, but a defendant who never asked for counsel has not yet made up his mind in the first instance. Pp. 6–13.

(c) *Stare decisis* does not require the Court to expand significantly the holding of a prior decision in order to cure its practical deficiencies. To the contrary, the fact that a decision has proved "unworkable" is a traditional ground for overruling it. *Payne* v. *Tennessee*, 501 U. S. 808, 827. Beyond workability, the relevant factors include the precedent's antiquity, the reliance interests at stake, and whether the decision was well reasoned. *Pearson* v. *Callahan*, 555 U. S. ___, ___. The first two cut in favor of jettisoning *Jackson:* the opinion is only two decades old, and eliminating it would not upset expectations, since any criminal defendant learned enough to order his affairs based on *Jackson*'s rule would also be perfectly capable of interacting with the police on his own. As for the strength of *Jackson*'s reasoning, when this Court creates a prophylactic rule to protect a constitutional right, the relevant "reasoning" is the weighing of the rule's benefits against its costs. *Jackson's* marginal benefits are dwarfed by its substantial costs. Even without *Jackson*, few badgering-induced waivers, if any, would be admitted at trial because the Court has taken substantial other, overlapping measures to exclude them. Under *Miranda*, any suspect subject to custodial interrogation must be advised of his right to have a lawyer present. 384 U. S., at 474. Under *Edwards*, once such a defendant "has invoked his *[Miranda]* right," interrogation must stop. 451 U. S., at 484. And under *Minnick* v. *Mississippi*, 498 U. S. 146, no subsequent interrogation may take place until counsel is present. *Id.,* at 153. These three layers of prophylaxis are sufficient. On the other side of the equation, the principal cost of applying *Jackson*'s rule is that crimes can go unsolved and criminals unpunished when uncoerced confessions are excluded and when officers are deterred from even trying to obtain confessions. The Court concludes that the *Jackson* rule does not "pay its way," *United States* v. *Leon*, 468 U. S. 897, 907–908, n. 6, and thus the case should be overruled. Pp. 13–18.

2. Montejo should nonetheless be given an opportunity to contend that his letter of apology should have been suppressed under the *Edwards* rule. He understandably did not pursue an *Edwards* objection, because *Jackson* offered broader protections, but the decision here changes the legal landscape. Pp. 18–19.

Syllabus

06–1807 (La.), 974 So. 2d 1238, vacated and remanded.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, and ALITO, JJ., joined. ALITO, J., filed a concurring opinion, in which KENNEDY, J., joined. STEVENS, J., filed a dissenting opinion, in which SOUTER and GINSBURG, JJ., joined, and in which BREYER, J., joined, except for n. 5. BREYER, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

### No. 07–1529

### JESSE JAY MONTEJO, PETITIONER *v.* LOUISIANA

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF LOUISIANA

### [May 26, 2009]

JUSTICE SCALIA delivered the opinion of the Court.

We consider in this case the scope and continued viability of the rule announced by this Court in *Michigan* v. *Jackson*, 475 U. S. 625 (1986), forbidding police to initiate interrogation of a criminal defendant once he has requested counsel at an arraignment or similar proceeding.

## I

Petitioner Jesse Montejo was arrested on September 6, 2002, in connection with the robbery and murder of Lewis Ferrari, who had been found dead in his own home one day earlier. Suspicion quickly focused on Jerry Moore, a disgruntled former employee of Ferrari's dry cleaning business. Police sought to question Montejo, who was a known associate of Moore.

Montejo waived his rights under *Miranda* v. *Arizona*, 384 U. S. 436 (1966), and was interrogated at the sheriff's office by police detectives through the late afternoon and evening of September 6 and the early morning of September 7. During the interrogation, Montejo repeatedly changed his account of the crime, at first claiming that he

had only driven Moore to the victim's home, and ulti-
mately admitting that he had shot and killed Ferrari in
the course of a botched burglary. These police interroga-
tions were videotaped.

On September 10, Montejo was brought before a judge
for what is known in Louisiana as a "72-hour hearing"—a
preliminary hearing required under state law.[1] Although
the proceedings were not transcribed, the minute record
indicates what transpired: "The defendant being charged
with First Degree Murder, Court ordered N[o] Bond set in
this matter. Further, Court ordered the Office of Indigent
Defender be appointed to represent the defendant." App.
to Pet. for Cert. 63a.

Later that same day, two police detectives visited Mon-
tejo back at the prison and requested that he accompany
them on an excursion to locate the murder weapon (which
Montejo had earlier indicated he had thrown into a lake).
After some back-and-forth, the substance of which re-
mains in dispute, Montejo was again read his *Miranda*
rights and agreed to go along; during the excursion, he
wrote an inculpatory letter of apology to the victim's
widow. Only upon their return did Montejo finally meet
his court-appointed attorney, who was quite upset that the
detectives had interrogated his client in his absence.

At trial, the letter of apology was admitted over defense
objection. The jury convicted Montejo of first-degree mur-
der, and he was sentenced to death.

The Louisiana Supreme Court affirmed the conviction
and sentence. 06–1807 (1/16/08), 974 So. 2d 1238 (2008).
As relevant here, the court rejected Montejo's argument
that under the rule of *Jackson*, *supra*, the letter should

_____

[1] "The sheriff or law enforcement officer having custody of an arrested
person shall bring him promptly, and in any case within seventy-two
hours from the time of the arrest, before a judge for the purpose of
appointment of counsel." La. Code Crim. Proc. Ann., Art. 230.1(A)
(West Supp. 2009).

have been suppressed. 974 So. 2d, at 1261. *Jackson* held that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." 475 U. S., at 636.

Citing a decision of the United States Court of Appeals for the Fifth Circuit, *Montoya* v. *Collins*, 955 F. 2d 279 (1992), the Louisiana Supreme Court reasoned that the prophylactic protection of *Jackson* is not triggered unless and until the defendant has actually requested a lawyer or has otherwise asserted his Sixth Amendment right to counsel. 974 So. 2d, at 1260–1261, and n. 68. Because Montejo simply stood mute at his 72-hour hearing while the judge ordered the appointment of counsel, he had made no such request or assertion. So the proper inquiry, the court ruled, was only whether he had knowingly, intelligently, and voluntarily waived his right to have counsel present during the interaction with the police. *Id.*, at 1261. And because Montejo had been read his *Miranda* rights and agreed to waive them, the Court answered that question in the affirmative, 974 So. 2d, at 1262, and upheld the conviction.

We granted certiorari. 554 U. S. \_\_\_ (2008).

## II

Montejo and his *amici* raise a number of pragmatic objections to the Louisiana Supreme Court's interpretation of *Jackson*. We agree that the approach taken below would lead either to an unworkable standard, or to arbitrary and anomalous distinctions between defendants in different States. Neither would be acceptable.

Under the rule adopted by the Louisiana Supreme Court, a criminal defendant must request counsel, or otherwise "assert" his Sixth Amendment right at the preliminary hearing, before the *Jackson* protections are

triggered. If he does so, the police may not initiate further interrogation in the absence of counsel. But if the court on its own appoints counsel, with the defendant taking no affirmative action to invoke his right to counsel, then police are free to initiate further interrogations provided that they first obtain an otherwise valid waiver by the defendant of his right to have counsel present.

This rule would apply well enough in States that require the indigent defendant formally to request counsel before any appointment is made, which usually occurs after the court has informed him that he will receive counsel if he asks for it. That is how the system works in Michigan, for example, Mich. Ct. Rule 6.005(A) (2009), whose scheme produced the factual background for this Court's decision in *Michigan* v. *Jackson.* Jackson, like all other represented indigent defendants in the State, had requested counsel in accordance with the applicable state law.

But many States follow other practices. In some two dozen, the appointment of counsel is automatic upon a finding of indigency, *e.g.*, Kan. Stat. Ann. §22–4503(c) (2007); and in a number of others, appointment can be made either upon the defendant's request or *sua sponte* by the court, *e.g.*, Del. Code Ann., Tit. 29, §4602(a) (2003). See App. to Brief for National Legal Aid & Defender Assn. et al. as *Amici Curiae* 1a–21a. Nothing in our *Jackson* opinion indicates whether we were then aware that not all States require that a defendant affirmatively request counsel before one is appointed; and of course we had no occasion there to decide how the rule we announced would apply to these other States.

The Louisiana Supreme Court's answer to that unresolved question is troublesome. The central distinction it draws—between defendants who "assert" their right to counsel and those who do not—is exceedingly hazy when applied to States that appoint counsel absent request from the defendant. How to categorize a defendant who merely

asks, prior to appointment, whether he will be appointed counsel? Or who inquires, after the fact, whether he has been? What treatment for one who thanks the court after the appointment is made? And if the court asks a defendant whether he would object to appointment, will a quick shake of his head count as an assertion of his right?

To the extent that the Louisiana Supreme Court's rule also permits a defendant to trigger *Jackson* through the "acceptance" of counsel, that notion is even more mysterious: How does one affirmatively accept counsel appointed by court order? An indigent defendant has no right to choose his counsel, *United States* v. *Gonzalez-Lopez*, 548 U. S. 140, 151 (2006), so it is hard to imagine what his "acceptance" would look like, beyond the passive silence that Montejo exhibited.

In practice, judicial application of the Louisiana rule in States that do not require a defendant to make a request for counsel could take either of two paths. Courts might ask on a case-by-case basis whether a defendant has somehow invoked his right to counsel, looking to his conduct at the preliminary hearing—his statements and gestures—and the totality of the circumstances. Or, courts might simply determine as a categorical matter that defendants in these States—over half of those in the Union—simply have no opportunity to assert their right to counsel at the hearing and are therefore out of luck.

Neither approach is desirable. The former would be particularly impractical in light of the fact that, as *amici* describe, preliminary hearings are often rushed, and are frequently not recorded or transcribed. Brief for National Legal Aid & Defender Assn. et al. 25–30. The sheer volume of indigent defendants, see *id.*, at 29, would render the monitoring of each particular defendant's reaction to the appointment of counsel almost impossible. And sometimes the defendant is not even present. *E.g.*, La. Code Crim. Proc. Ann., Art. 230.1(A) (West Supp. 2009) (allow-

ing court to appoint counsel if defendant is "unable to appear"). Police who did not attend the hearing would have no way to know whether they could approach a particular defendant; and for a court to adjudicate that question *ex post* would be a fact-intensive and burdensome task, even if monitoring were possible and transcription available. Because "clarity of . . . command" and "certainty of . . . application" are crucial in rules that govern law enforcement, *Minnick* v. *Mississippi*, 498 U. S. 146, 151 (1990), this would be an unfortunate way to proceed. See also *Moran* v. *Burbine*, 475 U. S. 412, 425–426 (1986).

The second possible course fares no better, for it would achieve clarity and certainty only at the expense of introducing arbitrary distinctions: Defendants in States that automatically appoint counsel would have no opportunity to invoke their rights and trigger *Jackson*, while those in other States, effectively instructed by the court to request counsel, would be lucky winners. That sort of hollow formalism is out of place in a doctrine that purports to serve as a practical safeguard for defendants' rights.

## III

But if the Louisiana Supreme Court's application of *Jackson* is unsound as a practical matter, then Montejo's solution is untenable as a theoretical and doctrinal matter. Under his approach, once a defendant is *represented* by counsel, police may not initiate any further interrogation. Such a rule would be entirely untethered from the original rationale of *Jackson*.

## A

It is worth emphasizing first what is *not* in dispute or at stake here. Under our precedents, once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings. *United*

*States* v. *Wade*, 388 U. S. 218, 227–228 (1967); *Powell* v. *Alabama*, 287 U. S. 45, 57 (1932). Interrogation by the State is such a stage. *Massiah* v. *United States*, 377 U. S. 201, 204–205 (1964); see also *United States* v. *Henry*, 447 U. S. 264, 274 (1980).

Our precedents also place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent. *Patterson* v. *Illinois*, 487 U. S. 285, 292, n. 4 (1988); *Brewer* v. *Williams*, 430 U. S. 387, 404 (1977); *Johnson* v. *Zerbst*, 304 U. S. 458, 464 (1938). The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled. *Michigan* v. *Harvey*, 494 U. S. 344, 352–353 (1990). And when a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick, even though the *Miranda* rights purportedly have their source in the *Fifth* Amendment:

> "As a general matter . . . an accused who is admonished with the warnings prescribed by this Court in *Miranda* . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." *Patterson*, *supra*, at 296.

The *only* question raised by this case, and the only one addressed by the *Jackson* rule, is whether courts must *presume* that such a waiver is invalid under certain circumstances. 475 U. S., at 630, 633. We created such a presumption in *Jackson* by analogy to a similar prophylactic rule established to protect the Fifth Amendment based *Miranda* right to have counsel present at any custodial interrogation. *Edwards* v. *Arizona*, 451 U. S. 477 (1981),

decided that once "an accused has invoked his right to have counsel present during custodial interrogation . . . [he] is not subject to further interrogation by the authorities until counsel has been made available," unless he initiates the contact. *Id.*, at 484–485.

The *Edwards* rule is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights," *Harvey*, *supra*, at 350. It does this by presuming his postassertion statements to be involuntary, "even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." *McNeil* v. *Wisconsin*, 501 U. S. 171, 177 (1991). This prophylactic rule thus "protect[s] a suspect's voluntary choice not to speak outside his lawyer's presence." *Texas* v. *Cobb*, 532 U. S. 162, 175 (2001) (KENNEDY, J., concurring).

*Jackson* represented a "wholesale importation of the *Edwards* rule into the Sixth Amendment." *Cobb*, *supra*, at 175. The *Jackson* Court decided that a request for counsel at an arraignment should be treated as an invocation of the Sixth Amendment right to counsel "at every critical stage of the prosecution," 475 U. S., at 633, despite doubt that defendants "actually inten[d] their request for counsel to encompass representation during any further questioning," *id.*, at 632–633, because doubts must be "resolved in favor of protecting the constitutional claim," *id.*, at 633. Citing *Edwards*, the Court held that any subsequent waiver would thus be "insufficient to justify police-initiated interrogation." 475 U. S., at 635. In other words, we presume such waivers involuntary "based on the supposition that suspects who assert their right to counsel are unlikely to waive that right voluntarily" in subsequent interactions with police. *Harvey*, *supra*, at 350.

The dissent presents us with a revisionist view of *Jackson*. The defendants' *request* for counsel, it contends, was important only because it proved that counsel *had been*

*appointed.* Such a non sequitur (nowhere alluded to in the case) hardly needs rebuttal. Proceeding from this fanciful premise, the dissent claims that the decision actually established "a rule designed to safeguard a defendant's right to rely on the assistance of counsel," *post*, at 6–7 (opinion of STEVENS, J.), not one "designed to prevent police badgering," *post*, at 7. To safeguard the right to assistance of counsel from *what*? From a knowing and voluntary waiver by the defendant himself? Unless the dissent seeks to prevent a defendant altogether from waiving his Sixth Amendment rights, *i.e.,* to "imprison a man in his privileges and call it the Constitution," *Adams* v. *United States ex rel. McCann*, 317 U. S. 269, 280 (1942)—a view with zero support in reason, history or case law—the answer must be: from police pressure, *i.e.,* badgering. The antibadgering rationale is the only way to make sense of *Jackson*'s repeated citations of *Edwards*, and the only way to reconcile the opinion with our waiver jurisprudence.[2]

### B

With this understanding of what *Jackson* stands for and whence it came, it should be clear that Montejo's interpretation of that decision—that no *represented* defendant can ever be approached by the State and asked to consent to interrogation—is off the mark. When a court appoints counsel for an indigent defendant in the absence of any request on his part, there is no basis for a presumption

---

[2] The dissent responds that *Jackson* also ensures that the defendant's counsel receives notice of any interrogation, *post*, at 6, n. 2. But notice to what end? Surely not in order to protect some constitutional right to receive counsel's advice regarding waiver of the right to have counsel present. Contrary to the dissent's intimations, neither the advice nor the presence of counsel is needed in order to effectuate a knowing waiver of the Sixth Amendment right. Our cases make clear that the *Miranda* waivers typically suffice; indeed, even an *unrepresented* defendant can waive his right to counsel. See *supra*, at 7.

that any subsequent waiver of the right to counsel will be involuntary. There is no "*initial* election" to exercise the right, *Patterson*, 487 U. S., at 291, that must be preserved through a prophylactic rule against later waivers. No reason exists to assume that a defendant like Montejo, who has done *nothing at all* to express his intentions with respect to his Sixth Amendment rights, would not be perfectly amenable to speaking with the police without having counsel present. And no reason exists to prohibit the police from inquiring. *Edwards* and *Jackson* are meant to prevent police from badgering defendants into changing their minds about their rights, but a defendant who never asked for counsel has not yet made up his mind in the first instance.

The dissent's argument to the contrary rests on a flawed *a fortiori:* "If a defendant is entitled to protection from police-initiated interrogation under the Sixth Amendment when he merely *requests* a lawyer, he is even more obviously entitled to such protection when he has *secured* a lawyer." *Post*, at 3. The question in *Jackson*, however, was not whether respondents were entitled to counsel (they unquestionably were), but "whether respondents validly waived their right to counsel," 475 U. S., at 630; and even if it is reasonable to presume from a defendant's *request* for counsel that any subsequent waiver of the right was coerced, no such presumption can seriously be entertained when a lawyer was merely "secured" on the defendant's behalf, by the State itself, as a matter of course. Of course, reading the dissent's analysis, one would have no idea that Montejo executed any waiver at all.

In practice, Montejo's rule would prevent police-initiated interrogation entirely once the Sixth Amendment right attaches, at least in those States that appoint counsel promptly without request from the defendant. As the dissent in *Jackson* pointed out, with no expressed disagreement from the majority, the opinion "most assuredly

[did] *not* hold that the *Edwards per se* rule prohibiting all police-initiated interrogations applies from the moment the defendant's Sixth Amendment right to counsel attaches, with or without a request for counsel by the defendant." 475 U. S., at 640 (opinion of Rehnquist, J.). That would have constituted a "shockingly dramatic restructuring of the balance this Court has traditionally struck between the rights of the defendant and those of the larger society." *Ibid.*

Montejo's rule appears to have its theoretical roots in codes of legal ethics, not the Sixth Amendment. The American Bar Association's Model Rules of Professional Conduct (which nearly all States have adopted into law in whole or in part) mandate that "a lawyer shall not communicate about the subject of [a] representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order." Model Rule 4.2 (2008). But the Constitution does not codify the ABA's Model Rules, and does not make investigating police officers lawyers. Montejo's proposed rule is both broader and narrower than the Model Rule. Broader, because Montejo would apply it to all agents of the State, including the detectives who interrogated him, while the ethical rule governs only lawyers. And narrower, because he agrees that if a defendant initiates contact with the police, they may talk freely—whereas a lawyer could be sanctioned for interviewing a represented party even if that party "initiates" the communication and consents to the interview. Model Rule 4.2, Comment 3.

Montejo contends that our decisions support his interpretation of the *Jackson* rule. We think not. Many of the cases he cites concern the substantive scope of the Sixth Amendment—*e.g.*, whether a particular interaction with the State constitutes a "critical" stage at which counsel is entitled to be present—*not* the validity of a Sixth Amend-

ment waiver. See *Maine* v. *Moulton*, 474 U. S. 159 (1985); *Henry*, 447 U. S. 264; *Massiah*, 377 U. S. 201; see also *Moran*, 475 U. S. 412. Since everyone agrees that absent a valid waiver, Montejo was entitled to a lawyer during the interrogation, those cases do not advance his argument.

Montejo also points to descriptions of the *Jackson* holding in two later cases. In one, we noted that "analysis of the waiver issue changes" once a defendant "obtains or even requests counsel." *Harvey*, 494 U. S., at 352. But elsewhere in the same opinion, we explained that *Jackson* applies "after a defendant requests assistance of counsel," 494 U. S., at 349; "when a suspect charged with a crime requests counsel outside the context of interrogation," *id.*, at 350; and to "suspects who assert their right to counsel," *ibid.* The accuracy of the "obtains" language is thus questionable. Anyway, since *Harvey* held that evidence obtained in violation of the *Jackson* rule *could* be admitted to impeach the defendant's trial testimony, 494 U. S., at 346, the Court's varying descriptions of when the rule was violated were dicta. The dictum from the other decision, *Patterson*, *supra,* at 290, n. 3, is no more probative.[3]

The upshot is that even on *Jackson*'s own terms, it

––––––––––

[3] In the cited passage, the Court noted that "[o]nce an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of attorney-client relationship takes effect." *Patterson*, 487 U. S., at 290, n. 3. To support that proposition, the Court cited *Maine* v. *Moulton*, 474 U. S. 159 (1985), which was not a case about waiver. The passage went on to observe that "the analysis changes markedly once an accused even *requests* the assistance of counsel," 487 U. S., at 290, n. 3 (emphasis in original), this time citing *Jackson*. Montejo infers from the "even *requests*" that having counsel is *more* conclusive of the invalidity of uncounseled waiver than the mere requesting of counsel. But the *Patterson* footnote did not suggest that the analysis "changes" in both these scenarios (having a lawyer, versus requesting one) with specific reference to the validity of waivers under the Sixth Amendment. The citation of *Moulton* (a nonwaiver case) for the first scenario suggests just the opposite.

would be completely unjustified to presume that a defendant's consent to police-initiated interrogation was involuntary or coerced simply because he had previously been appointed a lawyer.

IV

So on the one hand, requiring an initial "invocation" of the right to counsel in order to trigger the *Jackson* presumption is consistent with the theory of that decision, but (as Montejo and his *amici* argue, see Part II, *supra*) would be unworkable in more than half the States of the Union. On the other hand, eliminating the invocation requirement would render the rule easy to apply but depart fundamentally from the *Jackson* rationale.

We do not think that *stare decisis* requires us to expand significantly the holding of a prior decision— fundamentally revising its theoretical basis in the process—in order to cure its practical deficiencies. To the contrary, the fact that a decision has proved "unworkable" is a traditional ground for overruling it. *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991). Accordingly, we called for supplemental briefing addressed to the question whether *Michigan* v. *Jackson* should be overruled.

Beyond workability, the relevant factors in deciding whether to adhere to the principle of *stare decisis* include the antiquity of the precedent, the reliance interests at stake, and of course whether the decision was well reasoned. *Pearson* v. *Callahan*, 555 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 8). The first two cut in favor of abandoning *Jackson:* the opinion is only two decades old, and eliminating it would not upset expectations. Any criminal defendant learned enough to order his affairs based on the rule announced in *Jackson* would also be perfectly capable of interacting with the police on his own. Of course it is likely true that police and prosecutors have been trained to comply with *Jackson*, see generally Supplemental Brief

for Larry D. Thompson et al. as *Amici Curiae*, but that is
hardly a basis for retaining it as a constitutional require-
ment. If a State *wishes* to abstain from requesting inter-
views with represented defendants when counsel is not
present, it obviously may continue to do so.[4]

Which brings us to the strength of *Jackson*'s reasoning.
When this Court creates a prophylactic rule in order to
protect a constitutional right, the relevant "reasoning" is
the weighing of the rule's benefits against its costs. "The
value of any prophylactic rule . . . must be assessed not
only on the basis of what is gained, but also on the basis of
what is lost." *Minnick*, 498 U. S., at 161 (SCALIA, J., dis-
senting). We think that the marginal benefits of *Jackson*
(viz., the number of confessions obtained coercively that
are suppressed by its bright-line rule and would otherwise
have been admitted) are dwarfed by its substantial costs
(viz., hindering "society's compelling interest in finding,
convicting, and punishing those who violate the law,"
*Moran*, *supra,* at 426).

What does the *Jackson* rule actually achieve by way of
preventing unconstitutional conduct? Recall that the
purpose of the rule is to preclude the State from badgering
defendants into waiving their previously asserted rights.
See *Harvey*, *supra,* at 350; see also *McNeil*, 501 U. S., at
177. The effect of this badgering might be to coerce a
waiver, which would render the subsequent interrogation
a violation of the Sixth Amendment. See *Massiah*, *supra,*
at 204. Even though involuntary waivers are invalid even

_____

[4] The dissent posits a different reliance interest: "the public's interest
in knowing that counsel, once secured, may be reasonably relied upon
as a medium between the accused and the power of the State," *post*, at
9. We suspect the public would be surprised to learn that a criminal
can freely sign away his right to a lawyer, confess his crimes, and then
ask the courts to *assume* that the confession was coerced—on the
ground that he had, at some earlier point in time, made a *pro forma*
statement requesting that counsel be appointed on his behalf.

apart from *Jackson*, see *Patterson*, 487 U. S., at 292, n. 4, mistakes are of course possible when courts conduct case-by-case voluntariness review. A bright-line rule like that adopted in *Jackson* ensures that no fruits of interrogations made possible by badgering-induced involuntary waivers are ever erroneously admitted at trial.

But without *Jackson*, how many would be? The answer is few if any. The principal reason is that the Court has already taken substantial other, overlapping measures toward the same end. Under *Miranda*'s prophylactic protection of the right against compelled self-incrimination, any suspect subject to custodial interrogation has the right to have a lawyer present if he so requests, and to be advised of that right. 384 U. S., at 474. Under *Edwards*' prophylactic protection of the *Miranda* right, once such a defendant "has invoked his right to have counsel present," interrogation must stop. 451 U. S., at 484. And under *Minnick*'s prophylactic protection of the *Edwards* right, no subsequent interrogation may take place until counsel is present, "whether or not the accused has consulted with his attorney." 498 U. S., at 153.

These three layers of prophylaxis are sufficient. Under the *Miranda-Edwards-Minnick* line of cases (which is not in doubt), a defendant who does not want to speak to the police without counsel present need only say as much when he is first approached and given the *Miranda* warnings. At that point, not only must the immediate contact end, but "badgering" by later requests is prohibited. If that regime suffices to protect the integrity of "a suspect's voluntary choice not to speak outside his lawyer's presence" before his arraignment, *Cobb*, 532 U. S., at 175 (KENNEDY, J., concurring), it is hard to see why it would not also suffice to protect that same choice after arraignment, when Sixth Amendment rights have attached. And if so, then *Jackson* is simply superfluous.

It is true, as Montejo points out in his supplemental

brief, that the doctrine established by *Miranda* and *Edwards* is designed to protect Fifth Amendment, not Sixth Amendment, rights. But that is irrelevant. What matters is that these cases, like *Jackson,* protect the right to have counsel during custodial interrogation—which right happens to be guaranteed (once the adversary judicial process has begun) by *two* sources of law. Since the right under both sources is waived using the same procedure, *Patterson*, *supra,* at 296, doctrines ensuring voluntariness of the Fifth Amendment waiver simultaneously ensure the voluntariness of the Sixth Amendment waiver.

Montejo also correctly observes that the *Miranda-Edwards* regime is narrower than *Jackson* in one respect: The former applies only in the context of custodial interrogation. If the defendant is not in custody then those decisions do not apply; nor do they govern other, noninterrogative types of interactions between the defendant and the State (like pretrial lineups). However, those uncovered situations are the *least* likely to pose a risk of coerced waivers. When a defendant is not in custody, he is in control, and need only shut his door or walk away to avoid police badgering. And noninterrogative interactions with the State do not involve the "inherently compelling pressures," *Miranda*, *supra*, at 467, that one might reasonably fear could lead to involuntary waivers.

*Jackson* was policy driven, and if that policy is being adequately served through other means, there is no reason to retain its rule. *Miranda* and the cases that elaborate upon it already guarantee not simply noncoercion in the traditional sense, but what Justice Harlan referred to as "voluntariness with a vengeance," 384 U. S., at 505 (dissenting opinion). There is no need to take *Jackson*'s further step of requiring voluntariness on stilts.

On the other side of the equation are the costs of adding the bright-line *Jackson* rule on top of *Edwards* and other extant protections. The principal cost of applying any

exclusionary rule "is, of course, letting guilty and possibly dangerous criminals go free . . . ." *Herring* v. *United States*, 555 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 6). *Jackson* not only "operates to invalidate a confession given by the free choice of suspects who have received proper advice of their *Miranda* rights but waived them nonetheless," *Cobb*, *supra*, at 174–175 (KENNEDY, J., concurring), but also deters law enforcement officers from even trying to obtain voluntary confessions. The "ready ability to obtain uncoerced confessions is not an evil but an unmitigated good." *McNeil*, 501 U. S., at 181. Without these confessions, crimes go unsolved and criminals unpunished. These are not negligible costs, and in our view the *Jackson* Court gave them too short shrift.[5]

Notwithstanding this calculus, Montejo and his *amici* urge the retention of *Jackson*. Their principal objection to its elimination is that the *Edwards* regime which remains will not provide an administrable rule. But this Court has praised *Edwards* precisely because it provides "'clear and unequivocal' guidelines to the law enforcement profession," *Arizona* v. *Roberson*, 486 U. S. 675, 682 (1988). Our cases make clear which sorts of statements trigger its protections, see *Davis* v. *United States*, 512 U. S. 452, 459 (1994), and once triggered, the rule operates as a bright line. Montejo expresses concern that courts will have to determine whether statements made at preliminary hearings constitute *Edwards* invocations—thus implicating all the practical problems of the Louisiana rule we discussed above, see Part II, *supra*. That concern is misguided. "We

—————

[5] The dissent claims that, in fact, few confessions have been suppressed by federal courts applying *Jackson*. *Post*, at 8. If so, that is because, as the dissent boasts, "generations of police officers have been trained to refrain from approaching represented defendants," *post*, at 9, n. 4. Anyway, if the rule truly does not hinder law enforcement or make much practical difference, see *post*, at 7–9, and nn. 3–4, then there is no reason to be particularly exercised about its demise.

have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation'. . . ." *McNeil*, *supra*, at 182, n. 3. What matters for *Miranda* and *Edwards* is what happens when the defendant is approached for interrogation, and (if he consents) what happens during the interrogation—not what happened at any preliminary hearing.

In sum, when the marginal benefits of the *Jackson* rule are weighed against its substantial costs to the truth-seeking process and the criminal justice system, we readily conclude that the rule does not "pay its way," *United States* v. *Leon*, 468 U. S. 897, 907–908, n. 6 (1984). *Michigan* v. *Jackson* should be and now is overruled.

V

Although our holding means that the Louisiana Supreme Court correctly rejected Montejo's claim under *Jackson*, we think that Montejo should be given an opportunity to contend that his letter of apology should still have been suppressed under the rule of *Edwards*. If Montejo made a clear assertion of the right to counsel when the officers approached him about accompanying them on the excursion for the murder weapon, then no interrogation should have taken place unless Montejo initiated it. *Davis*, *supra*, at 459. Even if Montejo subsequently agreed to waive his rights, that waiver would have been invalid had it followed an "unequivocal election of the right," *Cobb*, 532 U. S., at 176 (KENNEDY, J., concurring).

Montejo understandably did not pursue an *Edwards* objection, because *Jackson* served as the Sixth Amendment analogy to *Edwards* and offered broader protections. Our decision today, overruling *Jackson*, changes the legal landscape and does so in part based on the protections already provided by *Edwards*. Thus we think that a remand is appropriate so that Montejo can pursue this alternative avenue for relief. Montejo may also seek on

remand to press any claim he might have that his Sixth Amendment waiver was not knowing and voluntary, *e.g.*, his argument that the waiver was invalid because it was based on misrepresentations by police as to whether he had been appointed a lawyer, cf. *Moran*, 475 U. S., at 428–429. These matters have heightened importance in light of our opinion today.

We do not venture to resolve these issues ourselves, not only because we are a court of final review, "not of first view," *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005), but also because the relevant facts remain unclear. Montejo and the police gave inconsistent testimony about exactly what took place on the afternoon of September 10, 2002, and the Louisiana Supreme Court did not make an explicit credibility determination. Moreover, Montejo's testimony came not at the suppression hearing, but rather only at trial, and we are unsure whether under state law that testimony came too late to affect the propriety of the admission of the evidence. These matters are best left for resolution on remand.

We do reject, however, the dissent's revisionist legal analysis of the "knowing and voluntary" issue. *Post*, at 10–14. In determining whether a Sixth Amendment waiver was knowing and voluntary, there is no reason categorically to distinguish an unrepresented defendant from a represented one. It is equally true for each that, as we held in *Patterson*, the *Miranda* warnings adequately inform him "of his right to have counsel present during the questioning," and make him "aware of the consequences of a decision by him to waive his Sixth Amendment rights," 487 U. S., at 293. Somewhat surprisingly for an opinion that extols the virtues of *stare decisis*, the dissent complains that our "treatment of the waiver question rests entirely on the dubious decision in *Patterson*," *post*, at 12. The Court in *Patterson* did not consider the result dubious, nor does the Court today.

\*       \*       \*

This case is an exemplar of Justice Jackson's oft quoted warning that this Court "is forever adding new stories to the temples of constitutional law, and the temples have a way of collapsing when one story too many is added." *Douglas* v. *City of Jeannette*, 319 U. S. 157, 181 (1943) (opinion concurring in result). We today remove *Michigan* v. *Jackson*'s fourth story of prophylaxis.

The judgment of the Louisiana Supreme Court is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

─────────────

No. 07–1529

─────────────

## JESSE JAY MONTEJO, PETITIONER *v.* LOUISIANA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
LOUISIANA

[May 26, 2009]

JUSTICE ALITO, with whom JUSTICE KENNEDY joins,
concurring.

Earlier this Term, in *Arizona* v. *Gant*, 556 U. S. \_\_\_
(2009), the Court overruled *New York* v. *Belton*, 453 U. S.
454 (1981), even though that case had been on the books
for 28 years, had not been undermined by subsequent
decisions, had been recently reaffirmed and extended, had
proven to be eminently workable (indeed, had been
adopted for precisely that reason), and had engendered
substantial law enforcement reliance. See *Gant*, *supra*, at
\_\_\_ (slip op., at 4) (ALITO, J., dissenting). The Court took
this step even though we were not asked to overrule *Belton* and this new rule is almost certain to lead to a host of
problems. See *Gant, supra*, at \_\_\_ (slip op., at 10) (ALITO,
J., dissenting); *Megginson* v. *United States*, *post*, p. \_\_\_;
*Grooms* v. *United States*, *post*, p. \_\_\_.

JUSTICE SCALIA, who cast the deciding vote to overrule
*Belton*, dismissed *stare decisis* concerns with the following
observation: "[I]t seems to me ample reason that the
precedent was badly reasoned and produces erroneous . . .
results." *Gant*, *supra*, at \_\_\_ (slip op., at 3) (concurring
opinion). This narrow view of *stare decisis* provides
the only principle on which the decision in *Gant* can be
justified.

In light of *Gant*, the discussion of *stare decisis* in today's

dissent* is surprising. The dissent in the case at hand criticizes the Court for "[a]cting on its own" in reconsidering *Michigan* v. *Jackson,* 475 U. S. 625 (1986). *Post*, at 4 (opinion of STEVENS, J.). But the same was true in *Gant*, and in this case, the Court gave the parties and interested *amici* the opportunity to submit supplemental briefs on the issue, a step not taken in *Gant.*

The dissent faults the Court for "cast[ing] aside the reliance interests of law enforcement," *post*, at 8–9, but in *Gant*, there were real and important law enforcement interests at stake. See 556 U. S., at ___ (slip op., at 5–6) (ALITO, J., dissenting). Even the Court conceded that the *Belton* rule had "been widely taught in police academies and that law enforcement officers ha[d] relied on the rule in conducting vehicle searches during the past 28 years." 556 U. S., at ___ (slip op., at 16). And whatever else might be said about *Belton*, it surely provided a bright-line rule.

A month ago, none of this counted for much, but today the dissent writes:

> "*Jackson*'s bright-line rule has provided law enforcement officers with clear guidance, allowed prosecutors to quickly and easily assess whether confessions will be admissible in court, and assisted judges in determining whether a defendant's Sixth Amendment rights have been violated by police interrogation." *Post*, at 8.

It is striking that precisely the same points were true in *Gant:*

> "[*Belton*'s] bright-line rule ha[d] provided law enforcement officers with clear guidance, allowed prose-

_____

*One of the dissenters in the present case, JUSTICE BREYER, also dissented in *Gant* and would have followed *Belton* on *stare decisis* grounds. See 556 U. S., at ___ (slip op., at 1). Thus, he would not overrule either *Belton* or *Michigan* v. *Jackson*, 475 U. S. 625 (1986).

cutors to quickly and easily assess whether [evidence obtained in a vehicle search] w[ould] be admissible in court, and assisted judges in determining whether a defendant's [Fourth] Amendment rights ha[d] been violated by police interrogation." *Post*, at 8.

The dissent, finally, invokes *Jackson*'s antiquity, stating that "the 23-year existence of a simple bright-line rule" should weigh in favor of its retention. *Post*, at 9. But in *Gant*, the Court had no compunction about casting aside a 28-year-old bright-line rule. I can only assume that the dissent thinks that our constitutional precedents are like certain wines, which are most treasured when they are neither too young nor too old, and that *Jackson*, at 23, is in its prime, whereas *Belton*, at 28, had turned brownish and vinegary.

I agree with the dissent that *stare decisis* should promote "'the evenhanded . . . development of legal principles,'" *post*, at 6 (quoting *Payne* v. *Tennessee*, 501 U. S. 808, 827–828 (1991)). The treatment of *stare decisis* in *Gant* fully supports the decision in the present case.

# SUPREME COURT OF THE UNITED STATES

——————

No. 07–1529

——————

## JESSE JAY MONTEJO, PETITIONER *v.* LOUISIANA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF LOUISIANA

[May 26, 2009]

JUSTICE STEVENS, with whom JUSTICE SOUTER and JUSTICE GINSBURG join, and with whom JUSTICE BREYER joins, except for footnote 5, dissenting.

Today the Court properly concludes that the Louisiana Supreme Court's parsimonious reading of our decision in *Michigan* v. *Jackson*, 475 U. S. 625 (1986), is indefensible. Yet the Court does not reverse. Rather, on its own initiative and without any evidence that the longstanding Sixth Amendment protections established in *Jackson* have caused any harm to the workings of the criminal justice system, the Court rejects *Jackson* outright on the ground that it is "untenable as a theoretical and doctrinal matter." *Ante*, at 6. That conclusion rests on a misinterpretation of *Jackson*'s rationale and a gross undervaluation of the rule of *stare decisis*. The police interrogation in this case clearly violated petitioner's Sixth Amendment right to counsel.

I

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The right to counsel attaches during "the initiation of adversary judicial criminal proceedings," *Rothgery* v. *Gillespie County*, 554 U. S. \_\_\_, \_\_\_ (2008) (slip op., at 5) (internal quotation

marks omitted), and it guarantees the assistance of counsel not only during in-court proceedings but during all critical stages, including postarraignment interviews with law enforcement officers, see *Patterson* v. *Illinois*, 487 U. S. 285, 290 (1988).

In *Jackson*, this Court considered whether the Sixth Amendment bars police from interrogating defendants who have requested the appointment of counsel at arraignment. Applying the presumption that such a request constitutes an invocation of the right to counsel "at every critical stage of the prosecution," 475 U. S., at 633, we held that "a defendant who has been formally charged with a crime and who has requested appointment of counsel at his arraignment" cannot be subject to uncounseled interrogation unless he initiates "exchanges or conversations with the police," *id.*, at 626.

In this case, petitioner Jesse Montejo contends that police violated his Sixth Amendment right to counsel by interrogating him following his "72-hour hearing" outside the presence of, and without prior notice to, his lawyer. The Louisiana Supreme Court rejected Montejo's claim. Relying on the fact that the defendants in *Jackson* had "requested" counsel at arraignment, the state court held that *Jackson*'s protections did not apply to Montejo because his counsel was appointed automatically; Montejo had not explicitly requested counsel or affirmatively accepted the counsel appointed to represent him before he submitted to police interrogation. 06–1807, pp. 28–29 (1/16/08), 974 So. 2d 1238, 1261.

I agree with the majority's conclusion that the Louisiana Supreme Court's decision, if allowed to stand, "would lead either to an unworkable standard, or to arbitrary and anomalous distinctions between defendants in different States," *ante*, at 3. Neither option is tolerable, and neither is compelled by *Jackson* itself.

Our decision in *Jackson* involved two consolidated cases,

both arising in the State of Michigan. Under Michigan law in effect at that time, when a defendant appeared for arraignment the court was required to inform him that counsel would be provided if he was financially needy *and he requested representation*. Mich. Gen. Ct. Rule 785.4(1) (1976). It was undisputed that the *Jackson* defendants made such a "request" at their arraignment: one by completing an affidavit of indigency, and the other by responding affirmatively to a question posed to him by the court. See App. in *Michigan* v. *Jackson*, O. T. 1984, No. 84–1531, p. 168; App. in *Michigan* v. *Bladel*, O. T. 1984, No. 84–1539, pp. 3a–4a. In neither case, however, was it clear that counsel had actually been appointed at the arraignment. Thus, the defendants' requests for counsel were significant as a matter of state law because they served as evidence that the appointment of counsel had been effectuated even in the absence of proof that defense counsel had actual notice of the appointments.

Unlike Michigan, Louisiana does not require a defendant to make a request in order to receive court-appointed counsel. Consequently, there is no reason to place constitutional significance on the fact that Montejo neither voiced a request for counsel nor affirmatively embraced that appointment *post hoc*. Certainly our decision in *Jackson* did not mandate such an odd rule. See *ante*, at 4 (acknowledging that we had no occasion to decide in *Jackson* how its rule would apply in States that do not make appointment of counsel contingent on affirmative request). If a defendant is entitled to protection from police-initiated interrogation under the Sixth Amendment when he merely *requests* a lawyer, he is even more obviously entitled to such protection when he has *secured* a lawyer. Indeed, we have already recognized as much. See *Michigan* v. *Harvey*, 494 U. S. 344, 352 (1990) (acknowledging that "once a defendant obtains or even requests counsel," *Jackson* alters the waiver analysis); *Patterson*, 487 U. S.,

at 290, n. 3 (noting "as a matter of some significance" to the constitutional analysis that defendant had "not retained, or *accepted by appointment*, a lawyer to represent him at the time he was questioned by authorities" (emphasis added)).[1]  Once an attorney-client relationship has been established through the appointment or retention of counsel, as a matter of federal law the method by which the relationship was created is irrelevant: The existence of a valid attorney-client relationship provides a defendant with the full constitutional protection afforded by the Sixth Amendment.

## II

Today the Court correctly concludes that the Louisiana Supreme Court's holding is "troublesome," *ante*, at 4, "impractical," *ante*, at 5, and "unsound," *ante*, at 6.  Instead of reversing the decision of the state court by simply answering the question on which we granted certiorari in a unanimous opinion, however, the majority has decided to change the law.  Acting on its own initiative, the majority overrules *Jackson* to correct a "theoretical and doctrinal" problem of its own imagining, see *ante*, at 6.  A more careful reading of *Jackson* and the Sixth Amendment cases upon which it relied reveals that the rule announced in *Jackson* protects a fundamental right that the Court now dishonors.

The majority's decision to overrule *Jackson* rests on its assumption that *Jackson*'s protective rule was intended to "prevent police from badgering defendants into changing their minds about their rights," *ante*, at 10; see also *ante*,

---

[1] In *Patterson* v. *Illinois*, we further explained, "[o]nce an accused has a lawyer," "a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect."  487 U. S., at 290, n. 3 (citing *Maine* v. *Moulton*, 474 U. S. 159, 176 (1985)). "Indeed," we emphasized, "the analysis changes markedly once an accused even *requests* the assistance of counsel."  487 U. S., at 290, n. 3.

at 13, just as the rule adopted in *Edwards* v. *Arizona*, 451 U. S. 477 (1981), was designed to prevent police from coercing unindicted suspects into revoking their requests for counsel at interrogation. Operating on that limited understanding of the purpose behind *Jackson*'s protective rule, the Court concludes that *Jackson* provides no safeguard not already secured by this Court's Fifth Amendment jurisprudence. See *Miranda* v. *Arizona*, 384 U. S. 436 (1966) (requiring defendants to be admonished of their right to counsel prior to custodial interrogation); *Edwards*, 451 U. S. 477 (prohibiting police-initiated interrogation following defendant's invocation of the right to counsel).

The majority's analysis flagrantly misrepresents *Jackson*'s underlying rationale and the constitutional interests the decision sought to protect. While it is true that the rule adopted in *Jackson* was patterned after the rule in *Edwards*, 451 U. S., at 484–485, the *Jackson* opinion does not even mention the anti-badgering considerations that provide the basis for the Court's decision today. Instead, *Jackson* relied primarily on cases discussing the broad protections guaranteed by the Sixth Amendment right to counsel—not its Fifth Amendment counterpart. *Jackson* emphasized that the purpose of the Sixth Amendment is to "'protec[t] the unaided layman at critical confrontations with his adversary,'" 475 U. S., at 631 (quoting *United States* v. *Gouveia*, 467 U. S. 180, 189 (1984)), by giving him "'the right to rely on counsel as a 'medium' between him[self] and the State,'" 475 U. S., at 632 (quoting *Maine* v. *Moulton*, 474 U. S. 159, 176 (1985)). Underscoring that the commencement of criminal proceedings is a decisive event that transforms a suspect into an accused within the meaning of the Sixth Amendment, we concluded that arraigned defendants are entitled to "at least as much protection" during interrogation as the Fifth Amendment affords unindicted suspects. See, *e.g.*, 475 U. S., at 632 ("[T]he *difference* between the legal basis for the rule

applied in *Edwards* and the Sixth Amendment claim
asserted in these cases actually provides additional sup-
port for the application of the rule in these circumstances"
(emphasis added)).  Thus, although the rules adopted in
*Edwards* and *Jackson* are similar, *Jackson* did not rely on
the reasoning of *Edwards* but remained firmly rooted in
the unique protections afforded to the attorney-client
relationship by the Sixth Amendment.[2]

Once *Jackson* is placed in its proper Sixth Amendment
context, the majority's justifications for overruling the
decision crumble.  Ordinarily, this Court is hesitant to
disturb past precedent and will do so only when a rule has
proven "outdated, ill-founded, unworkable, or otherwise
legitimately vulnerable to serious reconsideration."
*Vasquez* v. *Hillery*, 474 U. S. 254, 266 (1986).  While *stare
decisis* is not "an inexorable command," we adhere to it as
"the preferred course because it promotes the evenhanded,
predictable, and consistent development of legal princi-
ples, fosters reliance on judicial decisions, and contributes
to the actual and perceived integrity of the judicial proc-

---

[2] The majority insists that protection from police badgering is the
only purpose the *Jackson* rule can plausibly serve.  After all, it asks,
from what other evil would the rule guard?  See *ante*, at 9.  There are
two obvious answers. First, most narrowly, it protects the defendant
from any police-initiated interrogation without notice to his counsel, not
just from "badgering" which is not necessarily a part of police question-
ing.  Second, and of prime importance, it assures that any waiver of
counsel will be valid. The assistance offered by counsel protects a
defendant from surrendering his rights with an insufficient apprecia-
tion of what those rights are and how the decision to respond to inter-
rogation might advance or compromise his exercise of those rights
throughout the course of criminal proceedings.  A lawyer can provide
her client with advice regarding the legal and practical options avail-
able to him; the potential consequences, both good and bad, of choosing
to discuss his case with police; the likely effect of such a conversation on
the resolution of the charges against him; and an informed assessment
of the best course of action under the circumstances.  Such assistance
goes far beyond mere protection against police badgering.

ess." *Payne* v. *Tennessee*, 501 U. S. 808, 827–828 (1991).

Paying lip service to the rule of *stare decisis*, the majority acknowledges that the Court must consider many factors before taking the dramatic step of overruling a past decision. See *ante*, at 12. Specifically, the majority focuses on four considerations: the reasoning of the decision, the workability of the rule, the reliance interests at stake, and the antiquity of the precedent. The Court exaggerates the considerations favoring reversal, however, and gives short shrift to the valid considerations favoring retention of the *Jackson* rule.

First, and most central to the Court's decision to overrule *Jackson*, is its assertion that *Jackson*'s "'reasoning'"—which the Court defines as "the weighing of the [protective] rule's benefits against its costs," *ante*, at 14—does not justify continued application of the rule it created. The balancing test the Court performs, however, depends entirely on its misunderstanding of *Jackson* as a rule designed to prevent police badgering, rather than a rule designed to safeguard a defendant's right to rely on the assistance of counsel.[3]

Next, in order to reach the conclusion that the *Jackson*

―――――――

[3] Even accepting the majority's improper framing of *Jackson*'s foundation, the Court fails to show that the costs of the rule are more than negligible or differ from any other protection afforded by the right to counsel. The majority assumes, without citing any empirical or even anecdotal support, that any marginal benefits of the *Jackson* rule are "dwarfed by its substantial costs," which it describes as harm to "'society's compelling interest in finding, convicting, and punishing those who violate the law.'" *Ante*, at 14 (quoting *Moran* v. *Burbine*, 475 U. S. 412, 426 (1986)). That assumption is highly dubious, particularly in light of the fact that several *amici* with interest in law enforcement have conceded that the application of *Jackson*'s protective rule rarely impedes prosecution. See Supplemental Brief for Larry D. Thompson et al. as *Amici Curiae* 6 (hereinafter Thompson Supplemental Brief); Brief for United States as *Amicus Curiae* 12 (hereinafter United States Brief).

rule is unworkable, the Court reframes the relevant in-
quiry, asking not whether the *Jackson* rule as applied for
the past quarter century has proved easily administrable,
but instead whether the Louisiana Supreme Court's
cramped interpretation of that rule is practically worka-
ble. The answer to that question, of course, is no. When
framed more broadly, however, the evidence is overwhelm-
ing that *Jackson*'s simple, bright-line rule has done more
to advance effective law enforcement than to undermine it.

In a supplemental brief submitted by lawyers and
judges with extensive experience in law enforcement and
prosecution, *amici* Larry D. Thompson et al. argue per-
suasively that *Jackson*'s bright-line rule has provided law
enforcement officers with clear guidance, allowed prosecu-
tors to quickly and easily assess whether confessions will
be admissible in court, and assisted judges in determining
whether a defendant's Sixth Amendment rights have been
violated by police interrogation. See generally Thompson
Supplemental Brief 6. While *amici* acknowledge that
"*Jackson* reduces opportunities to interrogate defendants"
and "may require exclusion of evidence that could support
a criminal conviction," they maintain that "it is a rare case
where this rule lets a guilty defendant go free." *Ibid.*
Notably, these representations are not contradicted by the
State of Louisiana or other *amici*, including the United
States. See United States Brief 12 (conceding that the
*Jackson* rule has not "resulted in the suppression of sig-
nificant numbers of statements in federal prosecutions in
the past").[4] In short, there is substantial evidence sug-

––––––––

[4] Further supporting the workability of the *Jackson* rule is the fact
that it aligns with the professional standards and norms that already
govern the behavior of police and prosecutors. Rules of Professional
Conduct endorsed by the American Bar Association (ABA) and by every
State Bar Association in the country prohibit prosecutors from making
direct contact with represented defendants in all but the most limited
of circumstances, see App. to Supplemental Brief for Public Defender

gesting that *Jackson*'s rule is not only workable, but also desirable from the perspective of law enforcement.

Turning to the reliance interests at stake in the case, the Court rejects the interests of criminal defendants with the flippant observation that any who are knowledgeable enough to rely on *Jackson* are too savvy to need its protections, and casts aside the reliance interests of law enforcement on the ground that police and prosecutors remain free to employ the *Jackson* rule if it suits them. See *ante*, at 12. Again as a result of its mistaken understanding of the purpose behind *Jackson*'s protective rule, the Court fails to identify the real reliance interest at issue in this case: the public's interest in knowing that counsel, once secured, may be reasonably relied upon as a medium between the accused and the power of the State. That interest lies at the heart of the Sixth Amendment's guarantee, and is surely worthy of greater consideration than it is given by today's decision.

Finally, although the Court acknowledges that "antiquity" is a factor that counsels in favor of retaining precedent, it concludes that the fact *Jackson* is "only two decades old" cuts "in favor of abandoning" the rule it established. *Ante*, at 13. I would have thought that the

_____

Service for the District of Columbia et al. as *Amici Curiae* 1a–15a (setting forth state rules governing contact with represented persons); ABA Model Rule of Professional Conduct 4.2 (2008); 28 U. S. C. §530B(a) (making state rules of professional conduct applicable to federal attorneys), and generations of police officers have been trained to refrain from approaching represented defendants, both because *Jackson* requires it and because, absent direction from prosecutors, officers are reticent to interrogate represented defendants. See United States Brief 11–12; see also Thompson Supplemental Brief 13 (citing Federal Bureau of Investigation, Legal Handbook for Special Agents §7–4.1(7) (2003)). Indeed, the United States concedes that a decision to overrule the case "likely w[ill] not significantly alter the manner in which federal law enforcement agents investigate indicted defendants." United States Brief 11–12.

23-year existence of a simple bright-line rule would be a factor that cuts in the other direction.

Despite the fact that the rule established in *Jackson* remains relevant, well grounded in constitutional precedent, and easily administrable, the Court today rejects it *sua sponte*. Such a decision can only diminish the public's confidence in the reliability and fairness of our system of justice.[5]

## III

Even if *Jackson* had never been decided, it would be clear that Montejo's Sixth Amendment rights were violated. Today's decision eliminates the rule that "any waiver of Sixth Amendment rights given in a discussion initiated by police is presumed invalid" once a defendant has invoked his right to counsel. *Harvey*, 494 U. S., at 349 (citing *Jackson*, 475 U. S., at 636). Nevertheless, under the undisputed facts of this case, there is no sound basis for concluding that Montejo made a knowing and valid waiver of his Sixth Amendment right to counsel before acquiescing in police interrogation following his 72-hour hearing. Because police questioned Montejo without notice to, and outside the presence of, his lawyer, the

—————

[5] In his concurrence, JUSTICE ALITO assumes that my consideration of the rule of *stare decisis* in this case is at odds with the Court's recent rejection of his reliance on that doctrine in his dissent in *Arizona* v. *Gant*, 556 U. S. ___ (2009). While I agree that the reasoning in his dissent supports my position in this case, I do not agree with his characterization of our opinion in *Gant*. Contrary to his representation, the Court did not overrule our precedent in *New York* v. *Belton*, 453 U. S. 454 (1981). Rather, we affirmed the narrow interpretation of *Belton*'s holding adopted by the Arizona Supreme Court, rejecting the broader interpretation adopted by other lower courts that had been roundly criticized by judges and scholars alike. By contrast, in this case the Court flatly overrules *Jackson*—a rule that has drawn virtually no criticism—on its own initiative. The two cases are hardly comparable. If they were, and if JUSTICE ALITO meant what he said in *Gant,* I would expect him to join this opinion.

interrogation violated Montejo's right to counsel even under pre-*Jackson* precedent.

Our pre-*Jackson* case law makes clear that "the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." *Moulton*, 474 U. S., at 176. The Sixth Amendment entitles indicted defendants to have counsel notified of and present during critical confrontations with the state throughout the pretrial process. Given the realities of modern criminal prosecution, the critical proceedings at which counsel's assistance is required more and more often occur outside the courtroom in pretrial proceedings "where the results might well settle the accused's fate and reduce the trial itself to a mere formality." *United States* v. *Wade*, 388 U. S. 218, 224 (1967).

In *Wade*, for instance, we held that because a post-indictment lineup conducted for identification purposes is a critical stage of the criminal proceedings, a defendant and his counsel are constitutionally entitled to notice of the impending lineup. Accordingly, counsel's presence is a "requisite to conduct of the lineup, absent an intelligent waiver." *Id.*, at 237 (internal quotation marks omitted). The same reasoning applies to police decisions to interrogate represented defendants. For if the Sixth Amendment entitles an accused to such robust protection during a lineup, surely it entitles him to such protection during a custodial interrogation, when the stakes are as high or higher. Cf. *Spano* v. *New York*, 360 U. S. 315, 326 (1959) (Douglas, J., concurring) ("[W]hat use is a defendant's right to effective counsel at every stage of a criminal case if, while he is held awaiting trial, he can be questioned in the absence of counsel until he confesses?").

The Court avoids confronting the serious Sixth Amendment concerns raised by the police interrogation in this

case by assuming that Montejo validly waived his Sixth
Amendment rights before submitting to interrogation.[6]  It
does so by summarily concluding that "doctrines ensuring
voluntariness of the Fifth Amendment waiver simultane-
ously ensure the voluntariness of the Sixth Amendment
waiver," *ante*, at 15–16; thus, because Montejo was given
*Miranda* warnings prior to interrogation, his waiver was
presumptively valid.   Ironically, while the Court faults
*Jackson* for blurring the line between this Court's Fifth
and Sixth Amendment jurisprudence, it commits the same
error by assuming that the *Miranda* warnings given in
this case, designed purely to safeguard the Fifth Amend-
ment right against self-incrimination, were somehow
adequate to protect Montejo's more robust Sixth Amend-
ment right to counsel.

The majority's cursory treatment of the waiver question
rests entirely on the dubious decision in *Patterson*, in
which we addressed whether, by providing *Miranda* warn-
ings, police had adequately advised an indicted but unrep-
resented defendant of his Sixth Amendment right to coun-
sel.  The majority held that "[a]s a general matter . . . an
accused who is admonished with the warnings prescribed
. . . in *Miranda*, . . . has been sufficiently apprised of the
nature of his Sixth Amendment rights, and of the conse-
quences of abandoning those rights."  487 U. S., at 296.
The Court recognized, however, that "because the Sixth
Amendment's protection of the attorney-client relationship

---

[6] The majority leaves open the possibility that, on remand, Montejo
may argue that his waiver was invalid because police falsely told him
he had not been appointed counsel.  See *ante*, at 18.  While such police
deception would obviously invalidate any otherwise valid waiver of
Montejo's Sixth Amendment rights, Montejo has a strong argument
that, given his status as a *represented* criminal defendant, the *Miranda*
warnings given to him by police were insufficient to permit him to
make a knowing waiver of his Sixth Amendment rights even absent
police deception.

. . . extends beyond *Miranda*'s protection of the Fifth Amendment right to counsel, . . . there will be cases where a waiver which would be valid under *Miranda* will not suffice for Sixth Amendment purposes." *Id.*, at 297, n. 9. This is such a case.

As I observed in *Patterson*, the conclusion that *Miranda* warnings ordinarily provide a sufficient basis for a knowing waiver of the right to counsel rests on the questionable assumption that those warnings make clear to defendants the assistance a lawyer can render during post-indictment interrogation. See 487 U. S., at 307 (dissenting opinion). Because *Miranda* warnings do not hint at the ways in which a lawyer might assist her client during conversations with the police, I remain convinced that the warnings prescribed in *Miranda*,[7] while sufficient to apprise a defendant of his Fifth Amendment right to remain silent, are inadequate to inform an unrepresented, indicted defendant of his Sixth Amendment right to have a lawyer present at all critical stages of a criminal prosecution. The inadequacy of those warnings is even more obvious in the case of a *represented* defendant. While it can be argued that informing an indicted but unrepresented defendant of his right to counsel at least alerts him to the fact that he is entitled to obtain something he does not already possess, providing that same warning to a defendant who has *already* secured counsel is more likely to confound than enlighten.[8] By glibly assuming that that the *Miranda*

---

[7] Under *Miranda*, a suspect must be "warned prior to any questioning that he has the right to remain silent, that anything he says may be used against him in court of law, that he has the right to the presence of any attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires." 384 U. S., at 479.

[8] With respect to vulnerable defendants, such as juveniles and those with mental impairments of various kinds, *amici* National Association of Criminal Defense Lawyers et al. assert that "[o]verruling *Jackson* would be particularly detrimental . . . because of the confusing instruc-

warnings given in this case were sufficient to ensure
Montejo's waiver was both knowing and voluntary, the
Court conveniently avoids any comment on the actual
advice Montejo received, which did not adequately inform
him of his relevant Sixth Amendment rights or alert him
to the possible consequences of waiving those rights.

A defendant's decision to forgo counsel's assistance and
speak openly with police is a momentous one. Given the
high stakes of making such a choice and the potential
value of counsel's advice and mediation at that critical
stage of the criminal proceedings, it is imperative that a
defendant possess "a full awareness of both the nature of
the right being abandoned and the consequences of the
decision to abandon it," *Moran* v. *Burbine*, 475 U. S. 412,
421 (1986), before his waiver is deemed valid. See *Iowa* v.
*Tovar*, 541 U. S. 77, 81 (2004); *Johnson* v. *Zerbst*, 304
U. S. 458, 464 (1938). Because the administration of
*Miranda* warnings was insufficient to ensure Montejo
understood the Sixth Amendment right he was being
asked to surrender, the record in this case provides no
basis for concluding that Montejo validly waived his right
to counsel, even in the absence of *Jackson*'s enhanced
protections.

## IV

The Court's decision to overrule *Jackson* is unwar-
ranted. Not only does it rests on a flawed doctrinal prem-

_____

tions regarding counsel that they would receive. At the initial hearing,
they would likely learn that an attorney was being appointed for them,
In a later custodial interrogation, however, they would be informed in
the traditional manner of 'their right to counsel' and right to have
counsel 'appointed' if they are indigent, notwithstanding that counsel
had already been appointed in open court. These conflicting statements
would be confusing to anyone, but would be especially baffling to
defendants with mental disabilities or other impairments." Supple-
mental Brief for National Association of Criminal Defense Lawyers
et al. as *Amici Curiae* 7–8.

ise, but the dubious benefits it hopes to achieve are far outweighed by the damage it does to the rule of law and the integrity of the Sixth Amendment right to counsel. Moreover, even apart from the protections afforded by *Jackson*, the police interrogation in this case violated Jesse Montejo's Sixth Amendment right to counsel.

I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 07–1529

_____

## JESSE JAY MONTEJO, PETITIONER *v.*
## LOUISIANA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
LOUISIANA

[May 26, 2009]

JUSTICE BREYER, dissenting.

I join JUSTICE STEVENS' dissent except for footnote 5. Although the principles of *stare decisis* are not inflexible, I believe they bind the Court here. I reached a similar conclusion in *Arizona* v. *Gant*, 556 U. S. \_\_\_, \_\_\_–\_\_\_ (2009) (slip op., at 1–2) (BREYER, J., dissenting), and in several other recent cases. See, *e.g., Leegin Creative Leather Products, Inc.* v. *PSKS, Inc.*, 551 U. S. 877, \_\_\_– \_\_\_ (2007) (slip op., at 17–19) (BREYER, J., dissenting); *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, \_\_\_–\_\_\_ (2007) (slip op., at 65– 66) (BREYER, J., dissenting); *Federal Election Comm'n* v. *Wisconsin Right to Life, Inc.*, 551 U. S. 449, \_\_\_–\_\_\_ (2007) (slip op., at 31–32) (SOUTER, J., dissenting); *Bowles* v. *Russell*, 551 U. S. 205, 219–220 (2007) (SOUTER, J., dissenting); *Gonzales* v. *Carhart*, 550 U. S. 124, 190–191 (2007) (GINSBURG, J., dissenting); *District of Columbia* v. *Heller*, 554 U. S. \_\_\_, \_\_\_–\_\_\_ (2008) (slip op. at 41–45) (STEVENS, J., dissenting).