[Cite as *State v. Wyatt*, 2014-Ohio-3009.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

PREBLE COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2013-06-005 |
| | : | O P I N I O N |
| - vs - | | 7/7/2014 |
| | : | |
| CHARLES RANDALL WYATT, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM PREBLE COUNTY COURT OF COMMON PLEAS
Case No. 12-CR-11093


Martin P. Votel, Preble County Prosecuting Attorney, Eric E. Marit, Preble County Courthouse, 101 East Main Street, 1st Floor, Eaton, Ohio 45320, for plaintiff-appellee

Brian A. Muenchenbach, 130 West Second Street, Suite 2103, Dayton, Ohio 45402-1505, for defendant-appellant


**PIPER, J.**

{¶ 1} Defendant-appellant, Charles Wyatt, appeals his convictions in the Preble County Court of Common Pleas for illegal manufacture of drugs, aggravated possession of drugs, endangering children, and having drug paraphernalia.

{¶ 2} One of Wyatt's neighbors contacted police to report that strong chemical smells were coming from the direction of the property owned by Wyatt's father. Deputy Paul

Plaugher of the Preble County Sheriff's Office interviewed the neighbor, and learned that such odors had been coming from the Wyatt property for several months. The neighbor also explained that cars would come and go from the property at all times of the day and night, and stay only long enough for Wyatt to go out to the car and visit for a brief moment. Wyatt also littered the neighbor's property with empty water bottles, empty mineral spirits containers, and a propane tank with a retrofitted ball valve system that contained anhydrous ammonia. The neighbor also stated that Wyatt had installed an exhaust fan in the barn, and that when it was turned on, the chemical smell coming from the Wyatt property was much stronger.

{¶ 3} Deputy Plaugher and his partner went to the neighbor's property, and from there could smell a strong odor of what Deputy Plaugher believed to be ether coming from the direction of the Wyatt property. Specifically, the smell was emanating from the barn area of the property where Wyatt lived in a trailer.[1] From his position on the neighbor's property, Deputy Plaugher was able to hear the noise of an exhaust fan coming from the barn area. While Deputy Plaugher was on the property, he received a dispatch that required him to leave the neighbor's property for a short period. During that period, the neighbor called Deputy Plaugher to inform him that men on the Wyatt property had started a fire near the barn. Deputy Plaugher later returned to the neighbor's property to continue his observations of the Wyatt property, including the fire near the barn.

{¶ 4} Deputy Plaugher drafted an affidavit with the information he obtained from going to the neighbor's property, as well as his personal experience of smelling ether emanating from the Wyatt property, hearing an exhaust fan, and seeing the fire. Deputy Plaugher also averred what he had learned from the neighbor regarding cars coming and

---

1. The facts indicate that Wyatt's parents lived in a house on the property while Wyatt, his girlfriend, and her three children lived in a trailer located on the property immediately in front of the barn area.

going from the Wyatt property at all hours. Deputy Plaugher also averred that Wyatt was known to have a prior conviction for aggravated possession of drugs. From these facts, Deputy Plaugher averred his belief that a methamphetamine "cook" was occurring on the Wyatt property.

{¶ 5} Deputy Plaugher was granted the search warrant, and such was executed with the help of other officers from the Preble County Sheriff's Office. During the search, officers located several individuals on the property, including Tanessa Miller (Wyatt's girlfriend), Miller's three children, and John Dougherty. Wyatt was not found on the property at the time the warrant was executed. Upon execution of the warrant, officers found the methamphetamine "lab" in the barn, just as Deputy Plaugher suspected.

{¶ 6} The barn contained evidence that methamphetamine had been produced in the 24-48 hours before the warrant was executed. The barn also contained large quantities of finished methamphetamine, and Wyatt's fingerprint was found on a bowl in which the finished product was stored. Officers also seized other evidence of methamphetamine manufacturing, including lithium batteries, retrofitted propane tanks, and other chemicals necessary to the manufacturing process.

{¶ 7} Wyatt was indicted for illegal manufacture of drugs, illegal assembly or possession of chemicals for the illegal manufacture of drugs within the vicinity of a minor, aggravated possession of drugs, endangering children, and having drug paraphernalia. A warrant was issued for Wyatt's arrest.

{¶ 8} A few days after the arrest warrant was issued, Deputy Plaugher spoke to Wyatt on a phone after Wyatt's father made contact with his son in Deputy Plugher's presence. During the phone conversation, Wyatt claimed that he had been in Indianapolis before, during, and after the time that the warrant was executed, and that he had nothing to do with the manufacture of methamphetamine.

- 3 -

{¶ 9} Approximately three months later, Wyatt was arrested, arraigned, and appointed counsel. Three days after his arraignment, and while incarcerated at the Preble County Jail, Wyatt asked to speak to Deputy Plaugher. Deputy Plaugher read Wyatt his Miranda rights before speaking with him, and Wyatt executed a waiver of those rights. Wyatt then spoke to Deputy Plaugher outside the company of his appointed counsel. During their conversation, Wyatt admitted that John Doughtery had "cooked" methamphetamine for him, and that he was on his father's property the night before the search warrant was executed and not in Indiana as he had previously told Deputy Plaugher.

{¶ 10} Wyatt later moved for suppression of his statements, as well as the evidence seized from the barn and the Wyatt property during the execution of the search warrant. On the day of the suppression hearing, the state informed Wyatt that if he chose to move forward with his motion, any plea offers would be revoked. Wyatt moved forward with the motion to suppress hearing anyway, and the state in fact revoked a plea offer it had previously made. After the hearing, the trial court denied Wyatt's motion to suppress, and the matter proceeded to a two-day jury trial.

{¶ 11} The jury found Wyatt guilty of each count. The trial court merged some of the counts, and ordered an aggregate prison sentence of six years. Wyatt now appeals his convictions and sentence, raising the following assignments of error:

{¶ 12} Assignment of Error No. 1:

{¶ 13} THE TRIAL COURT ERRED WHEN IT DENIED MR. WYATT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF AN UNLAWFUL SEARCH AND FAILED TO SUPRESS [SIC] STATEMENTS MADE IN VIOLATION OF APPELLANT'S FIFTH AMENDMENT RIGHTS.

{¶ 14} Wyatt argues in his first assignment of error that his motion to suppress should have been granted.

{¶ 15} Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact. *State v. Cochran*, 12th Dist. Preble No. CA2006-10-023, 2007-Ohio-3353. Acting as the trier of fact, the trial court is in the best position to resolve factual questions and evaluate witness credibility. *Id.* Therefore, when reviewing the denial of a motion to suppress, a reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Oatis*, 12th Dist. Butler No. CA2005-03-074, 2005-Ohio-6038. "An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard." *Cochran* at ¶ 12.

{¶ 16} Wyatt first moved to suppress evidence seized as a result of the search warrant obtained by Deputy Plaugher and executed by the Preble County police.

{¶ 17} According to Crim.R. 41(C),

(1) A warrant shall issue on either an affidavit or affidavits sworn to before a judge of a court of record or an affidavit or affidavits communicated to the judge* * *. The affidavit shall name or describe the person to be searched or particularly describe the place to be searched, name or describe the property to be searched for and seized, state substantially the offense in relation thereto, and state the factual basis for the affiant's belief that such property is there located. * * *

(2) If the judge is satisfied that probable cause for the search exists, the judge shall issue a warrant identifying the property and naming or describing the person or place to be searched.

{¶ 18} When determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, "the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him * * * there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. George*, 45 Ohio St.3d 325 (1989), paragraph one of the syllabus.

{¶ 19} An appellate court should not substitute its judgment for that of the issuing court as to whether the affidavit contains sufficient probable cause upon which that court would issue the search warrant. *State v. Akers*, 12th Dist. Butler No. CA2007-07-163, 2008-Ohio-4164. "In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." *George,* paragraph two of the syllabus.

{¶ 20} During the motion to suppress hearing, Deputy Plaugher testified that he was informed of possible drug-related activity on the Wyatt property based upon a call made by one of Wyatt's neighbors. Deputy Plaugher testified that when he responded to the neighbor's home, he was close to the Wyatt property and could smell a "strong chemical smell, which smelled like ether" emanating from the barn area on the Wyatt property. Deputy Plaugher also testified that while he and his partner were on the property, they saw men leaving the barn on Wyatt's property, and that one man directed the other to lock the barn "tight." Deputy Plaugher also heard an exhaust fan running on the Wyatt property, and testified that in his experience, the smells coming from the Wyatt property were indicative of methamphetamine manufacturing.

{¶ 21} Deputy Plaugher took all of the information he learned from the neighbor, as well as his own personal observations, and submitted an affidavit explaining the reasons behind his belief that Wyatt was manufacturing methamphetamine in the barn. Plaugher specifically described the different places on the property where suspected drug activity was occurring, including the house, the barn, and Wyatt's trailer near the barn.

{¶ 22} Wyatt argues that Deputy Plaugher's affidavit was insufficient to establish probable cause to support the search warrant because no ether was ever discovered during the search, and therefore, Deputy Plaugher's statement that he smelled ether while near the

Wyatt property was "only included in the affidavit in an attempt to mislead the Judge into construing the information to establish probable cause."

{¶ 23} The record indicates that no ether was cataloged on the inventory of seized evidence as prepared by police after the search. That does not mean, however, that ether was never on the property or that Deputy Plaugher did not smell ether, or something similar, the night he investigated from the neighbor's property. The state suggests several reasons that ether was not inventoried after the seizure of evidence. As previously stated, the barn contained a large quantity of finished product, so that it is possible that the ether was used in whatever manufacturing occurred while Deputy Plaugher was investigating. The record also contains evidence that a hazardous materials team was on the scene after the warrant was executed and destroyed chemicals that were not taken into evidence. Or, it is possible that the men who started the fire on the property did so to dispose of the discarded containers for ingredients used during the manufacturing process. We agree with the state that there are several possibilities regarding what could have happened to the ether, if such did exist on the property. However, such a determination is not necessary, as there is no indication that Deputy Plaugher fabricated his observation of smelling chemicals coming from the Wyatt property to mislead the judge.

{¶ 24} The fact that no ether was found does not diminish the fact that other chemicals were found on the property that could account for the strong chemical smell, or that the neighbor who first called the police to report the suspicious activity complained of strong chemical smells coming from the Wyatt property without making any specific reference to ether. Moreover, the affidavit contained information other than specific mention of ether, such as cars coming and going from the property and other suspicious drug-related activity.

{¶ 25} After reviewing the record, we find that Deputy Plaugher's affidavit named the place to be searched, described the evidence to be searched for and seized, and stated

substantially the factual basis for his belief that evidence of methamphetamine manufacturing was located there. Given all the circumstances set forth in Deputy Plaugher's affidavit, there was a fair probability that contraband or evidence of a crime would be found on the Wyatt property. We also have reviewed the search warrant and find that the judge issued a proper warrant that identified the property, described the place to be searched, and described the evidence to be seized. As such, the search warrant and execution thereof was valid and the trial court properly overruled Wyatt's challenge to the warrant and evidence seized therefrom.

{¶ 26} Wyatt next argues that the trial court should have suppressed the statements he made to Deputy Plaugher once he had been arraigned on the charges and appointed counsel.

{¶ 27} "The Sixth Amendment right to counsel is triggered 'at or after the time that judicial proceedings have been initiated * * * whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Fellers v. United States*, 540 U.S. 519, 523, 124 S.Ct. 1019 (2004), quoting *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232 (1977). The United States Supreme Court has held that "an accused is denied 'the basic protections' of the Sixth Amendment 'when there [is] used against him at his trial evidence of his own incriminating words, which * * * agents * * * deliberately elicited from him after he had been indicted and in the absence of his counsel.'" *Fellers* at 523, quoting *Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199 (1964). However, "the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent." *Montejo v. Louisiana*, 556 U.S. 778, 786, 129 S.Ct. 2079, 2085 (2009). A defendant may waive his Sixth Amendment right whether or not he is already represented by counsel, and the decision to waive "need not itself be counseled." *Id.* When a defendant is read his Miranda rights, which expressly include the right to have counsel present during interrogation, and agrees to waive those rights, a valid waiver occurs. *Id.*

{¶ 28} "Nothing in the Sixth Amendment prevents a suspect charged with a crime and represented by counsel from voluntarily choosing, on his own, to speak with police in the absence of an attorney." *Michigan v. Harvey*, 494 U.S. 344, 352, 110 S.Ct. 1176 (1990). "Although a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will." *Id.* at 353.

{¶ 29} The record is clear that Wyatt was arraigned and appointed counsel so that his Sixth Amendment rights were triggered. However, the record is equally clear that Wyatt expressly initiated contact with Deputy Plaugher and asked to speak to him outside the presence of his attorney. The record contains an "inmate request form" written by Wyatt while he was incarcerated at the Preble County Jail. Within the request form, Wyatt stated, "I need to speak with Officer [sic] Plaugher or the head of the Meth task force team. Thank You." This written request was issued solely at Wyatt's request, and based upon his free will and desire to speak to Deputy Plaugher.

{¶ 30} The record contains evidence that when Deputy Plaugher spoke to Wyatt at the jail, he advised Wyatt of his Miranda rights and Wyatt expressly waived such by signing a Miranda waiver form. Within the form, the Miranda rights are expressly stated, and Wyatt affirmed that he understood the rights, was able to read, and that he understood what he read about the rights. The next section of the waiver states, "understanding what you have read and what has been read to you about your rights, will you now make a statement and answer questions, *without your lawyer being present*, concerning" the manufacturing of methamphetamine at the Wyatt property? (Emphasis added.) Wyatt answered "yes" to the question, and proceeded to give his statement to Deputy Plaugher.

{¶ 31} Unlike an instance where a suspect is afforded his Sixth Amendment rights and such rights are then violated when police initiate interrogation outside the presence of the suspect's attorney, Deputy Plaugher never initiated contact with Wyatt once Wyatt was

appointed counsel. Wyatt himself initiated contact with Deputy Plaugher, and further waived his right to remain silent by signing a waiver of his rights after such were fully explained to him.

{¶ 32} Notably, the waiver form Wyatt signed made specific reference to the discussion occurring without Wyatt's lawyer being present, and Wyatt agreed to talk to Deputy Plaugher without his counsel present. As such, Wyatt waived his rights, and no violation of the Fifth or Sixth Amendments occurred. *See State v. Geldrich*, 12th Dist. Butler No. CA2006-10-267, 2008-Ohio-2622 (affirming denial of motion to suppress where appellant made statement to officers of his own accord and officers did not deliberately elicit appellant's statement after his Sixth Amendment rights were triggered).

{¶ 33} Wyatt places great emphasis on the fact that at the time Deputy Plaugher advised him of his rights, Deputy Plaugher was unaware that Wyatt had been appointed counsel. However, such a fact is irrelevant because Deputy Plaugher did not initiate the contact and did not take any action to interrogate Wyatt once Wyatt was arraigned. It was within Wyatt's free will, and own decision-making process, to request an audience with Deputy Plaugher. Despite what Deputy Plaugher knew or did not know, Wyatt himself knew that he had been appointed counsel and had the right to have counsel present during his interaction with Deputy Plaugher. Wyatt, however, elected to waive his rights, and Deputy Plughter not knowing that Wyatt had previously been appointed counsel does not vitiate that valid waiver.

{¶ 34} Having found that the search warrant was properly issued and executed, and that Wyatt's rights were not violated when he gave his statement to Deputy Plaugher, Wyatt's first assignment of error is overruled.

{¶ 35} Assignment of Error No. 2:

{¶ 36} THE TRIALL [SIC] COURT ERRED WHEN IT OVERRULED APPELLANT'S

CRIM.R. 29 MOTION FOR JUDGMENT OF ACQUITTAL BECAUSE THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION AND/OR APPELLANT'S CONVICTION [SIC] IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 37} Wyatt argues in his second assignment of error that his convictions were against the manifest weight of the evidence and were not supported by sufficient evidence, and that his Crim.R. 29 motion should therefore have been granted.

{¶ 38} This court reviews a trial court's decision on a Crim.R. 29(C) motion for acquittal using the same standard as that is used to review a sufficiency of the evidence claim. *State v. Grindstaff*, 12th Dist. Clermont No. CA2013-09-074, 2014-Ohio-2581. When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would support a conviction. *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, superseded on other grounds.

{¶ 39} A manifest weight challenge examines the inclination of the greater amount of credible evidence offered at trial to support one side of the issue rather than the other. *Wilson*, 2007-Ohio-2298.

> In determining whether a conviction is against the manifest weight of the evidence, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Cummings*, 12th Dist. Butler No. CA2006-09-224, 2007-Ohio-4970, ¶ 12.

{¶ 40} While appellate review includes the responsibility to consider the credibility of

witnesses and the weight given to the evidence, "these issues are primarily matters for the trier of fact to decide since the trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given the evidence." *State v. Walker*, 12th Dist. Butler No. CA2006-04-085, 2007-Ohio-911, ¶ 26. Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances to correct a manifest miscarriage of justice, and only when the evidence presented at trial weighs heavily in favor of acquittal. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 41} Wyatt was convicted of illegal manufacture of drugs in violation of R.C. 2925.04(A), which provides that "no person shall knowingly * * * manufacture or otherwise engage in any part of the production of a controlled substance." Wyatt was also convicted of illegal assembly or possession of chemicals for the manufacture of drugs in violation of R.C. 2925.041(A), which provides that "no person shall knowingly assemble or possess one or more chemicals that may be used to manufacture a controlled substance in schedule I or II with the intent to manufacture a controlled substance * * *." Wyatt was also convicted of possession of drugs in violation of R.C. 2925.11(A), which provides that, "no person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." Wyatt was also convicted of endangering children in violation of R.C. 2919.22(B)(6), which criminalizes permitting children to be on the same property, "and within one hundred feet of" the manufacturing or illegal assembly of drugs "when the person knows that the act is occurring * * *." Lastly, Wyatt was convicted of having drug paraphernalia in violation of R.C. 2925.14(C)(1), which provides that "no person shall knowingly use, or possess with purpose to use, drug paraphernalia."

{¶ 42} As all of these crimes essentially relate to the state's charge that Wyatt manufactured methamphetamine, Wyatt argues that the state failed to prove that he was responsible for the methamphetamine "cook" on the property, and that he did not knowingly

possess the chemicals used in the illegal assembly of methamphetamine.

{¶ 43} According to R.C. 2901.22(B), "a person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."

{¶ 44} Possession means "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). Possession may be actual or constructive. *State v. Bowling*, 12th Dist. Butler No. CA2013-08-159, 2014-Ohio-1690. "Constructive possession exists when one is conscious of the presence of the object and able to exercise dominion and control over it, even if it is not within one's immediate physical possession." *Id.* at ¶ 35. Dominion and control can be proven by circumstantial evidence alone. *State v. Gaefe*, 12th Dist. Clinton No. CA2001-11-043, 2002-Ohio-4995, ¶ 10.

{¶ 45} Despite Wyatt's arguments to the contrary, the state presented evidence during the trial that, when viewed in a light most favorable to the prosecution, proves that he committed each of the crimes for which he was convicted.

{¶ 46} The state first called Wyatt's neighbor, who had reported the suspicious behavior at the Wyatt property to police. The neighbor testified that she had a clear view of the Wyatt property and was aware of who lived on the property, including that Wyatt lived in the trailer by the barn. The neighbor testified that Wyatt's girlfriend, Tanessa Miller, and Miller's three children also lived in the trailer with Wyatt. The neighbor testified that there was suspicious behavior on the Wyatt property, including cars coming and going at all hours of the day and night, seven days a week. The cars would drive the length of the property until they reached the barn, and stay only long enough for Wyatt to go to the car, talk for a minute,

and then leave.  The neighbor testified that the same cars would make this trip time and again.

{¶ 47} The neighbor also testified that Wyatt approached her and told her that he had cut a path on her back property near the barn area.  The neighbor stated that when she surveyed the path, Wyatt had littered the area with empty water bottles, a five gallon bucket, mineral spirits cans, and a propane tank that was retrofitted with ball valves.  When the neighbor and her husband opened the tank, anhydrous ammonia came out of the tank.  The neighbor testified that she confronted Wyatt with the tank in front of his parents, and that he denied that it was his.  However, Wyatt later asked the neighbor to return the tank to him because he had "a lot of money invested in that tank."

{¶ 48} The neighbor testified that she could smell strong odors of chemicals coming from the property, and that Wyatt had installed an exhaust fan in the barn that made the smells coming from the barn even stronger.  The neighbor testified that she saw Wyatt take items into the barn mere moments before the exhaust fan would turn on and the chemical smell would emanate from the barn.

{¶ 49} The state next called Deputy Plaugher, who testified about being called out to the neighbor's property to investigate possible drug-related crimes.  Deputy Plaugher testified that when he went to the back of the neighbor's property near the Wyatt property, he too could smell a strong chemical odor.  Deputy Plaugher and his partner stayed in the area of the neighbor's property where they could see the barn, and Deputy Plaugher testified that two men exited the barn and one told the other to lock the barn "tight."  Although Deputy Plaugher and his partner tried to follow the two men, they were unable to do so, and were then dispatched to respond to an unrelated alarm.

{¶ 50} Deputy Plaugher testified that after he left the neighbor's property to respond to the alarm, he was again contacted within a short time by the neighbor.  Deputy Plaugher

testified that he and his partner later returned to the neighbor's property to continue the investigation, and detailed the circumstances surrounding procuring the search warrant and executing it.

{¶ 51} Deputy Plaugher testified that when he and the other Preble County police officers executed the warrant, they apprehended John Doughtery, and also found Tenessa Miller and her three children coming from the trailer next to the barn. Deputy Plaugher testified that the trailer is well within 100 feet of the barn; he stated that you cannot open the door to the barn without hitting the trailer. During the search, police seized pseudoephedrine pills, methamphetamine, marijuana and drug paraphernalia, as well as a glass bowl that contained methamphetamine and Wyatt's fingerprint.

{¶ 52} During Deputy Plaugher's testimony, the state played a tape of the recorded conversation between Wyatt and Deputy Plaugher after Wyatt asked to speak to the deputy. Within the conversation, Wyatt admitted that he was in the barn the day before the arrest warrant was executed, and also that he permitted others to manufacture methamphetamine in the barn. Wyatt also told Deputy Plaugher that he knew "what was going on over there" in reference to methamphetamine manufacturing in the barn.

{¶ 53} The state also called Captain Dean Miller of the Preble County Sherriff's Office. Captain Miller testified that he had been trained in investigating and processing clandestine methamphetamine labs. Captain Miller testified to the process of manufacturing methamphetamine and the materials required for the process, including lithium batteries, pseudoephedrine pills, mineral spirits, and anhydrous ammonia.

{¶ 54} Captain Miller testified that he took part in execution of the search warrant on the Wyatt property, and that when he first entered the barn, he had to leave immediately because of the noxious chemical odors. Once Captain Miller put on protective gear, he entered the barn and located materials necessary for the manufacturing of

- 15 -

methamphetamine, including pseudoephedrine "sludge," batteries, and chemicals.[2]

{¶ 55} The state also presented testimony from Agent Dwight Aspacher, a 14-year veteran of the Ohio Bureau of Criminal Identification and Investigation.  Agent Aspacher specializes in investigating clandestine drug laboratories, and has investigated over a thousand such laboratories.  Agent Aspacher testified that he investigated the barn on the Wyatt property and during the investigation, he located and identified materials used in the manufacturing of methamphetamine.  Agent Aspacher also testified that he found pill "sludge," as well as finished methamphetamine in multiple containers.  Agent Aspacher testified that the barn was filled with various containers and implements, such as coffee grinders to grind pseudoephedrine pills, used in the manufacturing of methamphetamine, and that the containers were caked with methamphetamine residue.

{¶ 56} Agent Aspacher testified that he also found a propane cylinder that contained anhydrous ammonia, which was specially adapted with valves to make it easier to load the cylinder with ammonia.  When asked his assessment of whether the barn contained a clandestine methamphetamine lab, Agent Aspacher said "yes," and based his assessment on the presence of pill sludge, chemical waste, crystallization and methamphetamine residue in the containers, a cooking tin, chemicals, lithium batteries, mineral spirits, and the ventilation system.

{¶ 57} Based on the testimony and evidence, the state proved that Wyatt was conscious of the presence of the methamphetamine laboratory in the barn, as well as all of the tools, materials, and ingredients used in the manufacturing process. The testimony of Wyatt's neighbor demonstrated that Wyatt himself carried items into the barn, met with the

---

2. Captain Miller testified that those who manufacture methamphetamine crush pseudoephedrine tablets and then pour chemicals over the crushed material to extract the components necessary for methamphetamine production.  Once the liquid is drained off, the leftover materials are referred to as "sludge" and used a second time.

"customers" who came to the property to purchase drugs, and put money and work into creating the necessary tools to manufacture methamphetamine, such as the retrofitted propane tank that Wyatt wanted to retrieve from the neighbor.

{¶ 58} Other evidence established that Wyatt exercised dominion and control over the methamphetamine and related materials. Wyatt's fingerprint was found on a container in which finished methamphetamine was found during the search, and he freely admitted to permitting others to manufacture methamphetamine in the barn. Wyatt himself admitted that he was in the barn on the day before the warrant was executed, and the evidence established that methamphetamine had been manufactured in the barn 24-48 hours prior to the execution of the search warrant.

{¶ 59} While Wyatt argues that his convictions are against the manifest weight of the evidence and not supported by sufficient evidence, we disagree. The jury heard all of the testimony, considered the evidence, and found the state's theory of the case and its witnesses credible. We will not disturb such a finding on appeal. Nor do we find that the jury clearly lost its way or created a manifest miscarriage of justice that requires reversal. Having found that Wyatt's convictions were supported by sufficient evidence and were not rendered against the manifest weight of the evidence, we overruled Wyatt's second assignment of error.

{¶ 60} Assignment of Error No. 3:

{¶ 61} MR. WYATT WAS DEPRIVED OF HIS DUE PROCESS RIGHTS WHEN FORCED TO ACCEPT OR REJECT A PLEA OFFER CONTINGENT UPON WHETHER MR. WYATT MOVED FORWARD WITH A SUPPRESSION HEARING.

{¶ 62} Wyatt argues in his final assignment of error that he was deprived of his due process rights when the state revoked its plea offer once he moved forward with the motion to suppress hearing.

{¶ 63} Despite Wyatt's argument to the contrary, a criminal defendant does not have a constitutional right to a plea bargain. *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837 (1977). Instead, the prosecutor acts within the state's discretion in proposing plea agreements to defendants. *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663 (1978). As such, "the state is not required to offer a defendant a plea bargain and is permitted to withdraw a plea offer at any time." *State v. Hart*, 8th Dist. Cuyahoga No. 84531, 2005-Ohio-107, ¶ 10, citing *Mabry v. Johnson*, 467 U.S. 504, 104 S.Ct. 2543 (1984).

{¶ 64} The record indicates that the state offered Wyatt a plea agreement, which would have dismissed two of the counts, reduced the degree of one count, and limited Wyatt's prison sentence to three years. Before the motion to suppress hearing began, the state clearly indicated that if Wyatt moved forward with his motion to suppress, the plea offer would be revoked and the matter would proceed to a jury trial. The trial court summarized the agreement before the hearing began, explained the benefits of such agreement to Wyatt, and confirmed no less than four times that Wyatt wanted to reject the offer and move forward.

{¶ 65} The fact that Wyatt chose to reject the state's offer does not, however, render his due process rights violated. Wyatt was clearly aware of the consequences of rejecting the plea and having his case decided by a jury. Wyatt chose to disregard such consequences in the hope of being acquitted by the jury, and the state was well within its authority to withdraw the plea offer. As such, we overrule Wyatt's final assignment of error.

{¶ 66} Judgment affirmed.


RINGLAND, P.J., and S. POWELL, J., concur.