# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
June 14, 2016

Plaintiff-Appellee,

v

No. 325568
Wayne Circuit Court
LC No. 14-005270-FC

CARL DUNCAN ALLEN,

Defendant-Appellant.

Before: MURRAY, P.J., and STEPHENS and RIORDAN, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first-degree premeditated murder, MCL 750.316, and possession of a firearm during the commission of a felony ("felony-firearm"), MCL 750.227b. He was sentenced to life imprisonment for his first-degree murder conviction to run consecutive to two years' imprisonment for his felony-firearm conviction. We affirm defendant's convictions, reverse defendant's sentences, and remand for resentencing.

## I. FACTUAL BACKGROUND

This case arises from the shooting death of Antonio Dwight Revis in June 2014. Shortly after midnight on June 5, 2014, Revis and his then-girlfriend, Jaleesa Underwood, drove to the corner of Sanilac Street and Morang Avenue in Detroit, Michigan. Upon their arrival, Underwood parked her silver 2012 Dodge Charger on Sanilac Street near the corner. Revis exited the car and walked toward the back of the vehicle. According to Underwood, three young males walked out of a house on the street and met Revis behind the vehicle. She noticed that one of the males was defendant, whom she recognized from the neighborhood. Revis talked with the three men for a period of time. Suddenly, Underwood saw defendant and another chase Revis toward Morang Avenue and heard approximately four gunshots. She immediately started her vehicle and made a U-turn in order to follow the commotion. She then observed defendant standing over a now-prostrate Revis, shooting "a couple more times" into his body.

Robert Williams, an unrelated bystander who happened to be in the area sitting in his car, observed the events in a similar way. Williams saw two males chasing another male down the street and heard approximately four gunshots. He started his car and drove away when he heard the gunfire. However, when he returned a short time later, he saw Revis on the ground and Underwood crying.

-1-

At the scene, a Detroit police officer found three unfired .380-caliber cartridges and four spent nine-millimeter casings. At approximately 4:00 p.m. on June 5, 2014, the same day of the shooting, Detroit police officers apprehended defendant and two other men in a Checker cab. The officers noticed that one of the men, Fernando Williams, was sitting on top of a Walter PK .380-caliber pistol. Subsequent DNA testing on the pistol indicated that defendant was not a significant contributor to the DNA on the gun.

On June 6, 2014, defendant was interviewed by Detroit police officers. Defendant initially told the officers that he was present at the scene of the offense, but his friend "Tay" was responsible for the shooting. Defendant then told the officers that he held an unloaded nine-millimeter pistol during the incident, but he did not shoot Revis. Later, however, when asked, "Why did you shoot 'Tone, and how do you feel about it?", defendant replied, "I feel bad." The officers then asked, "Why did you shoot him?" Defendant replied, "Cuz, he . . . I thought he had something to do with killing my daddy . . . ." At the end of the interview, when asked if he killed Revis, defendant responded, "I ain't sure I want to answer that." When asked why, defendant reasoned, "I rather for them to prove it." One of the officers then retorted, "But you just told me you shot him." Defendant replied, "But you didn't write it down." Defendant then asked the officer to write down that he did not shoot Revis.

At trial, in addition to the witnesses' testimony and defendant's statement during the interview, the prosecution presented testimony from the doctor who conducted an autopsy on Revis's body as well as testimony regarding the results of ballistics testing on the bullets recovered from the body. The ballistics testing revealed that three of the bullets came from the .380-caliber pistol recovered by the police, three other bullets came from a gun that could have been a .380-caliber, .38-caliber, or 9-millimeter pistol, and the last bullet possibly came from the same gun as the latter three bullets. A jury then convicted defendant of first-degree murder and felony-firearm.

Defendant now appeals as of right.

## II. FAILURE TO REQUEST THE APPOINTMENT OF EXPERT WITNESSES

Defendant first argues that defense counsel provided ineffective assistance when he failed to request the appointment of expert witnesses on the subjects of eyewitness identification and false confessions. We disagree.

### A. STANDARD OF REVIEW AND APPLICABLE LAW

Because defendant did not move for a new trial or a *Ginther*[1] hearing in the trial court, and no *Ginther* hearing was held,[2] our review of his ineffective assistance of counsel claim is

---

[1] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

[2] Defendant filed a motion to remand this case for an evidentiary hearing pursuant to MCR 7.211(C)(1), which we denied. *People v Allen*, unpublished order of the Court of Appeals, entered August 13, 2015 (Docket No. 325568).

limited to mistakes apparent from the record. *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009); *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). "A claim of ineffective assistance of counsel is a mixed question of law and fact. A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *Petri*, 279 Mich App at 410, citing *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

The United States and Michigan Constitutions guarantee a defendant the right to the effective assistance of counsel. US Const, Am VI; Const 1963, art 1, § 20. In order to prove that counsel provided ineffective assistance, a defendant must demonstrate that (1) " 'counsel's representation fell below an objective standard of reasonableness,' " and (2) defendant was prejudiced, i.e., "that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v Vaughn*, 491 Mich 642, 669-671; 821 NW2d 288 (2012), quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "A defendant must also show that the result that did occur was fundamentally unfair or unreliable." *People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012). "Effective assistance of counsel is presumed," and a defendant bears a heavy burden of proving otherwise. *Petri*, 279 Mich App at 410; see also *Vaughn*, 491 Mich at 670 ("Defense counsel should be strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.") (quotation marks and citation omitted).

"[D]ecisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, which we will not second-guess with the benefit of hindsight. . . . [T]he failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense." *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004) (quotation marks and footnotes omitted).

## B. DEFENSE IDENTIFICATION STRATEGY

It is apparent from the record that defense counsel's strategy was to demonstrate, through unrelenting cross-examination and an acerbic closing argument, that Underwood *intentionally lied* when she identified defendant as the shooter, not that Underwood mistakenly identified defendant. In particular, defense counsel dynamically attacked Underwood's credibility by emphasizing her past theft conviction, her inability to consistently recount the number of times that she had seen defendant previously, and her inconsistent statements regarding the number of gunshots that she heard during the incident. Requesting an expert on the unreliability of witness identification testimony would have been inconsistent with this defense strategy, and we will not second-guess defense counsel's decisions on this with the benefit of hindsight. See *id*. Likewise, given defense counsel's cross-examination and closing argument, failing to call such an expert did not deprive defendant of the defense that Underwood was an unreliable witness. See *id*. Further, in light of defense counsel's cross-examination of Underwood, counsel may have reasonably concluded that presenting expert testimony on eyewitness identifications would have been cumulative to his defense or redundant for the jury, as such an expert would have "stat[ed] the obvious: memories and perceptions are sometimes inaccurate." *People v Cooper*, 236 Mich App 643, 658; 601 NW2d 409 (1999).

Thus, defendant has not overcome the presumption that defense counsel's decision not to call an expert was sound trial strategy. See *id*. Accordingly, he has failed to establish that defense counsel's performance fell below an objective standard of reasonableness. See *Vaughn*, 491 Mich at 669-671.

In addition, even if defense counsel's performance fell below an objective standard of reasonableness, defendant has not met the test's second prong. He has failed to establish the factual predicate of his claim, as he "offers no proof that an expert witness would have testified favorably if called by the defense." *People v Ackerman*, 257 Mich App 434, 455-456; 669 NW2d 818 (2003). Although he cites secondary sources and cases discussing the unreliability of eyewitness identifications in general, he provides no proof, apart from his own speculation based on the cited literature, that an expert would have testified in his favor if called by the defense *in this case*. For this reason alone, defendant has failed to establish the requisite prejudice. See *id*. Further, given the significant evidence of defendant's involvement in the crime, and the fact that the jury apparently believed the majority of Underwood's testimony despite defense counsel's zealous cross-examination, there is not a reasonable probability that the outcome of the trial would have been different but for defense counsel's failure to request an eyewitness identification expert. See *Vaughn*, 491 Mich at 669-671.

## C. FALSE CONFESSIONS

Defendant next argues that defense counsel was ineffective for failing to request an expert witness on false confessions. Defendant again does not overcome the presumption that defense counsel's decision not to call such an expert was a reasonable trial strategy. In the trial court, defense counsel argued that defendant's statement to the police did not constitute a confession *at all*. Given this position, presenting an expert on false confessions, and thereby implicitly conceding that defendant made *a confession*, would have been inconsistent with counsel's defense strategy. As stated, we will not second-guess this strategy with the benefit of hindsight.

In addition, defendant has failed to establish the factual basis of his claim, as he provides no proof of the content of such expert testimony and, accordingly, offers no proof that an expert would have testified in his favor. See *Ackerman*, 257 Mich App at 455-456. Rather, he again cites secondary sources and cases discussing circumstances that often give rise to false confessions and general indicators of false confessions, contending that defendant's police interview displays all of these factors. Contrary to defendant's claims, it is possible that an expert would have testified contrary to defendant's position. Further, without any indication of the actual content and foundation of an expert's testimony, defendant has failed to demonstrate that the testimony would have been admissible in this case. See *People v Kowalski*, 492 Mich 106, 132-138; 821 NW2d 14 (2012) (upholding the exclusion of expert testimony "based on research and literature about the phenomenon of false confessions" under MRE 702, but leaving open the possibility of admitting psychological testing evidence consisting of the "defendant's psychological profile, which [was] constructed from psychological tests and clinical interviews of defendant."). Accordingly, defendant has failed to show that there is a reasonable probability that the outcome of the trial would have been different but for defense counsel's failure to request an expert on false confessions. See *Vaughn*, 491 Mich at 669-671.

### III. SUPPRESSION OF DEFENDANT'S STATEMENT TO THE POLICE

Defendant next asserts that his statement to the police during his interview was involuntary and, therefore, erroneously admitted by the trial court. Similarly, defendant contends that defense counsel was ineffective for failing to move to suppress his statement. We disagree.

### A. STANDARD OF REVIEW

To the extent that defendant generally challenges the admissibility of his statement, as well as the trial court's failure to conduct, *sua sponte*, a *Walker*[3] hearing, these claims are unpreserved because defendant never moved to suppress the statement or requested a *Walker* hearing to determine whether his statement was voluntary. We review unpreserved issues for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Defendant's ineffective assistance claim is reviewed under the rules discussed *supra*.

### B. ANALYSIS

As an initial matter, the record shows that the defense stipulated to the admission of the video containing defendant's statement to the police and stipulated that defendant knowingly and voluntarily waived his constitutional rights before the interview. Accordingly, to the extent that defendant contends that his statement to the police was inadmissible because he did not voluntarily waive his rights, and argues that the trial court should have held, *sua sponte*, a hearing on the voluntariness of his statement, defendant has waived review of these claims.[4] See *Vaughn,* 491 Mich at 663 ("[W]aiver is the *intentional* relinquishment or abandonment of a known right. A defendant who waives a right extinguishes the underlying error and may not seek appellate review of a claimed violation of that right.") (quotation marks and footnotes omitted).

Next, we reject defendant's claim of ineffective assistance based on defense counsel's failure to move to suppress defendant's statement. First, defendant has failed to overcome the strong presumption that this decision was a reasonable exercise of professional judgment. See *Vaughn*, 491 Mich at 670; *Petri*, 279 Mich App at 410. As demonstrated by the parties'

---

[3] *People v Walker (On Rehearing)*, 374 Mich 331, 337-338; 132 NW2d 87 (1965).

[4] The trial court should conduct an "inquiry into the voluntariness of the [confession]" *sua sponte* if there are "certain alerting circumstances," such as "a defendant's mental, emotional or physical condition, evidence of police threats, or other obvious forms of physical and mental duress." *People v Ray*, 431 Mich 260, 269-271; 430 NW2d 626 (1988) (quotation marks and citation omitted). However, the trial court is required to hold a *Walker* hearing *sua sponte* only in "cases in which the evidence clearly and substantially reflects a question about the voluntary nature of a confession or implicates other due process concerns." *Id*. at 271. Even if defendant had not waived review of this issue, the record includes no evidence of alerting circumstances that would require the court to hold a *Walker* hearing *sua sponte* in this case.

stipulation on the record, it is clear that defense counsel proactively agreed to the introduction of defendant's statement to police, seemingly because he wished for the jury to hear defendant's account of the circumstances of the crime and his relationship with the victim. Likewise, it is apparent that counsel wanted the jury to hear defendant's multiple denials of shooting Revis. Although this strategy proved unsuccessful, it would have been inconsistent and unreasonable for defense counsel to both stipulate to the admission of the video so that the jury would have the opportunity to consider the entirety of defendant's statement and also attempt to suppress the statement on constitutional grounds.

Further, the record shows that defendant's statement was admissible, as it was made after he voluntarily, knowingly, and intelligently waived his Fifth Amendment rights.[5] "Statements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waived his or her Fifth Amendment rights." *People v Gipson*, 287 Mich App 261, 264; 787 NW2d 126 (2010). "A waiver is voluntary if it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* at 264-265. Regarding the voluntariness of a confession,

> [t]he test of voluntariness . . . [is] whether, considering the totality of all the surrounding circumstances, the confession is "the product of an essentially free and unconstrained choice by its maker," or whether the accused's "will has been overborne and his capacity for self-determination critically impaired . . . ." The line of demarcation "is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession."
>
> In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.
>
> The absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness. The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the

---

[5] We note that a waiver of *Miranda* rights can constitute a knowing and intelligent waiver of a defendant's Fifth and Sixth Amendment rights. *Montejo v Louisiana*, 556 US 778, 786-787; 129 S Ct 2079; 173 L Ed 2d 955 (2009).

confession indicates that it was freely and voluntarily made. [*People v Cipriano*, 431 Mich 315, 333-334; 429 NW2d 781 (1988) (citations omitted).]

Additionally, a court should consider the defendant's overall mental and physical state and any promises of leniency. *Gipson*, 287 Mich App at 264. "Whether a waiver was made knowingly and intelligently requires an inquiry into defendant[']s level of understanding, irrespective of police conduct." *Id.* "A defendant does not need to understand the consequences and ramifications of waiving his or her rights. A very basic understanding of those rights is all that is necessary." *Id.* Moreover, a waiver need not be express: if the record shows that a *Miranda*[6] warning was given and that the defendant understood the warning, his "uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis v Thompkins*, 560 US 370, 384; 130 S Ct 2250; 176 L Ed 2d 1098 (2010).

On appeal, defendant contends that his confession was involuntary for the following reasons: "[He] was just shy of his 18th birthday . . . . He was questioned for a long time and stated to the officers that he hadn't been sleeping since the incident. The interview demonstrates that he was unsophisticated and susceptible to manipulation." Despite defendant's claims regarding his own vulnerability, defendant does not, in fact, assert that the officers engaged in anything improper. Further, there is no indication in the record, including the video recording of the police interview, that defendant was coerced, intimidated, or deceived into waiving his constitutional rights, or that his subsequent statement was involuntary.

When the interview began, one of the officers stated that he would read aloud each of defendant's rights and defendant should indicate whether he understood each one. If defendant did not understand something, the officer would explain it to him. The officer then proceeded to read each *Miranda* right to defendant, and defendant said, "Okay," after hearing each right. Defendant then signed a written advice of rights form, initialing next to each right. He later stated that he can read and write. After defendant acknowledged his rights, the officers did not physically abuse or coerce defendant into speaking, and they provided water and food from the vending machine during the interview. Although defendant was 17 years old at the time,[7] defendant's statements throughout the interview evinced a knowledge of police procedure and a level of maturity that further indicates that defendant voluntarily waived his rights and answered

---

[6] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[7] It is noteworthy that defendant emphasized during the police interview that he was born in October 1995 and, therefore, was 18 years old during the interview on June 6, 2014. When the officers stated that they had received paperwork indicating that defendant was born in 1996, defendant reasoned that someone must have made a mistake because he was born in 1995. However, other documents in the lower court record indicate that defendant was born in October 1996 and, thus, was 17 years old at the time of the offense and police interview. The prosecution stated in its supplemental brief on appeal that it obtained defendant's birth certificate and confirmed that he was born in October 1996.

the officers' questions.[8]  Additionally, there is no indication that the length of the interview, which was approximately three hours, or defendant's lack of sleep allowed him to be manipulated or coerced by the officers, or that these factors affected the voluntariness of his statement.  Further, the record includes no basis for concluding that any other factors exist for finding that defendant's statement was involuntary.  See *Cipriano*, 431 Mich at 333-334.  Thus, in considering the totality of the circumstances, the record shows that defendant voluntarily, knowingly, and intelligently waived his Fifth Amendment rights and voluntarily answered the officers' questions, such that his statement was constitutionally valid and admissible.  See *id*.

Defendant also suggests that defense counsel was ineffective for failing to move to suppress defendant's confession because "there were solid grounds for arguing that after [defendant] maintained that he needed a lawyer[,] . . . the interview should have stopped at that time."  "When a defendant invokes his right to counsel, the police must terminate their interrogation immediately and may not resume questioning until such counsel arrives.  However, the defendant's invocation of his right to counsel must be unequivocal." *People v Tierney*, 266 Mich App 687, 710-711; 703 NW2d 204 (2005) (citations omitted).  A defendant who merely states, "Maybe I should talk to an attorney," does not unequivocally invoke his right to counsel. *Id.* at 711.

Here, although defendant appeared to consider out loud whether he needed a lawyer near the end of the interview, his request was equivocal.  After the officers restated Underwood's account of the incident, defendant said, "If [Underwood] said I fired a gun out there, I need a lawyer then."  The first officer then asked, "So is that what you're saying, you want a lawyer?"  Defendant responded, "I mean, what other choice do I have [when] y'all saying I fired a gun and I didn't."  The second officer began to reply, "You have the choice to tell the truth because . . . ," but he then stopped himself and asked, "Well, do you want a lawyer?  That's up to you.  We don't care."  Defendant responded, "I mean, I want y'all to help me out with the situation."  The first officer stated, "You have to help yourself.  You gotta tell me, because you brought up the lawyer, do you want to stop this interview?"  Defendant replied, "No, sir."  The first officer asked, "So you want to continue this interview without a lawyer?"  Defendant answered, "Yes."  The officers then asked if defendant was sure and stated that they did not care either way.  The first officer also said, "This is your last opportunity, so I want you to decide if you want a lawyer or you want to continue talking to us."  Defendant again asked the officers to "help [him] in any type of way," and the first officer replied, "What I'm telling you is, I cannot further this conversation if you asking [sic] for a lawyer."  The second officer clarified, "If you're saying you don't want a lawyer, then we can continue.  If you saying [sic] you want a lawyer, we are done."  Defendant replied, "I only want a lawyer if I need one."  The second officer then said, "You're not understanding the question."  Defendant then replied, "No, I don't want one.  Can I finish the conversation?"

---

[8] For example, defendant at one point stated, "I rather for them to prove it."  This indicates defendant's understanding of the prosecution's burden in prosecuting a case.

On this record, defendant's statements were not sufficiently unequivocal to invoke his right to counsel and require termination of the interview. See *Tierney*, 266 Mich App at 710-711. When defendant mentioned the prospect of a lawyer, the officers immediately stopped the interrogation and repeatedly asked defendant whether he wanted a lawyer, rephrasing the question in multiple ways to ensure that defendant understood the implications of asking for a lawyer. Defendant then clearly stated that he did not want a lawyer and asked to finish the interview. Thus, defendant's confession was admissible, as his statement was not elicited in violation of his constitutional rights.

Accordingly, defense counsel's failure to move to suppress defendant's statement did not constitute ineffective assistance, as "[f]ailing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

## IV. CRUEL AND UNUSUAL PUNISHMENT

In a supplemental brief, defendant argues that his sentence of mandatory life imprisonment without parole violates his Eight Amendment right against cruel and unusual punishment because he was 17 years old when he committed the offenses. The prosecution agrees that resentencing is required in this case.

## A. STANDARD OF REVIEW

We review unpreserved constitutional claims for plain error affecting substantial rights. *People v Bowling*, 299 Mich App 552, 557; 830 NW2d 800 (2013).

## B. ANALYSIS

In *Miller v Alabama*, ___ US ___; 132 S Ct 2455, 2460; 183 L Ed 2d 407 (2012), the United States Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " See also *Montgomery v Louisiana*, ___ US ___; 136 S Ct 718, 734; 193 L Ed 2d 599 (2016) (holding that *Miller* has retroactive application). However, in *Miller*, "the Court fell short of categorically barring life without parole for juvenile offenders; instead, it held that a sentencing court must 'take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' " *People v Perkins*, ___ Mich App ___, ___; ___ NW2d ___ (2016) (Docket Nos. 323454, 323876, 325741), slip op at 14; quoting *Miller*, 132 S Ct at 2469. See also *People v Skinner*, 312 Mich App 15, 27; 877 NW2d 482 (2015). Accordingly, our Legislature enacted MCL 769.25 and MCL 769.25a in response to *Miller*, which provide a series of requirements that must be fulfilled in order to impose a term of life imprisonment without parole on a juvenile offender, including, among other things, the requirement that a trial court must consider the factors listed in *Miller* when determining whether a juvenile offender should be sentenced to life without parole.

Here, the prosecution agrees that defendant was 17 years old when he committed the offense and concedes that he is entitled to resentencing pursuant to MCL 769.25. In particular, the prosecution recognizes that it failed to file a motion requesting a *Miller* sentencing hearing within 21 days after defendant's conviction, as required by MCL 769.25(3). Thus, the

prosecution agrees that defendant is entitled to be sentenced to a term of years, as provided under MCL 769.25(9), given its failure to file such a motion. MCL 769.25(4). See *People v Perkins*, ___ Mich App at ___; slip op at 16.

Thus, as the parties agree, we conclude that resentencing is required pursuant to MCL 769.25.

## V. CONCLUSION

We reject defendant's ineffective assistance and evidentiary claims. Accordingly, we affirm his convictions. However, we agree with the parties that resentencing is required.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Cynthia Diane Stephens
/s/ Michael J. Riordan