McCLENDON, J.
The defendant, Calvin Bernard Jefferson, was charged by grand jury indictment with second degree murder, a violation of LSA-R.S. 14:30.1. The defendant pled not guilty. He filed a motion to suppress his statement. A hearing was held on the matter, and the motion was denied. Two days into trial, the defendant withdrew his not guilty plea, and at a Boykin hearing, pled guilty pursuant to North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), and State v. Crosby, 338 So.2d 584 (La. 1976). See Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). (R. pp. 88-89, 1246-60). He was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The defendant now appeals, designating one assignment of error. For the following reasons, we affirm the conviction and sentence.
*795 FACTS
At the Boykin hearing, for the factual basis for the Alford plea, the prosecutor stated that if the trial were continued to verdict, "the State would present all evidence that was told to the jury in opening statement from all witnesses going forward and would present everything that I said in opening statement." The trial court added that "the Court can certainly take judicial notice of the testimony and evidence solicited thus far."[1] The pertinent parts of the State's opening statement were as follows: Nicole Jefferson lived in Green Leaves Subdivision in Mandeville with her four children and the defendant, her ex-husband. Nicole worked and needed the defendant's help with the children. Their twelve-year relationship was marred with the defendant perpetrating acts of domestic violence on Nicole. On the night of April 29, 2012, Nicole went missing. A week later, on May 6, her partially decomposed body was found in a wooded area off of I-12 (near La. Hwy 21). Her head had been severed. The defendant killed Nicole on April 29, 2012, then later that night drove to Wal-Mart and bought ammonia. He put her body in Nicole's van and dumped her in the woods. He then drove to a carwash and cleaned the van.
ASSIGNMENT OF ERROR
In his sole assignment of error, the defendant argues that the trial court erred in denying his motion to suppress his statement. Specifically, the defendant contends he made a statement after invoking his right to counsel.
The defendant argues in brief that on two occasions, his right to counsel was violated. The defendant avers that after he told Sergeant Alvin Hotard, with the St. Tammany Parish Sheriff's Office, that he had an attorney, Detective Jerry McDowell with the St. Tammany Parish Sheriff's Office had a discussion with him thereby violating his right to counsel. Then, according to the defendant, after the booking process at the Calcasieu Parish Sheriff's Office, he stated he had a lawyer, "thereby [in]voking his right to counsel again." The defendant claims the detectives from St. Tammany were in the room and should have heard this request, but they interviewed him, anyway. As such, according to the defendant, Sergeant Hotard and Detective McDowell again violated his right to counsel.
As to the events that transpired at the Calcasieu Parish Sheriff's Office, the defendant suggests in brief that Detective McDowell did not know the defendant had asked for an attorney when the detective entered the warrants office where the defendant was being booked because it "was an opportunity for him to talk to me." This, according to the defendant in brief, was the first violation of his right to counsel. The defendant then suggests in brief that "Deputy Price" (actually, Lieutenant (now Captain) Raymond Price, with the Calcasieu Parish Sheriff's Office) testified that, after the booking process, the defendant stated that he had a lawyer, "thereby invoking his right to counsel again." According to the defendant, the St. Tammany detectives were in the room when the defendant asked for this attorney this "second time" and, "absent some extraordinary circumstance, they would have heard his request."
*796 We note, however, that the defendant's informing Sergeant Hotard that he had an attorney (on May 8, 2012) was the first time the defendant had made this known. The second time the defendant said he had an attorney was after the detectives interviewed the defendant, left the Calcasieu Parish Sheriff's Office for the evening, then returned to Lake Charles because they were informed the defendant had made a statement to an officer at the Calcasieu Parish Sheriff's Office. When they approached the defendant for the second time in Lake Charles (the next day), at that time the defendant said he had an attorney. The detectives, accordingly, did not talk to the defendant.
As further discussed below, the source of confusion for the defendant is apparently the mistaken belief that the defendant's informing Sergeant Hotard that he had an attorney was a separate event from the occasion when Captain Price heard the defendant say he had an attorney. The defendant suggests that when he arrived at the Calcasieu Parish Sheriff's Office, prior to the booking process, he told Sergeant Hotard he had an attorney; and then after the booking process, the defendant again said he had an attorney. But the time Sergeant Hotard first spoke to the defendant and was told he had an attorney was during the booking process, the same time that Captain Price heard the defendant say he had an attorney.
Here, the motion to suppress hearing was split up over a large amount of time. That is, the first part of the motion to suppress hearing was conducted on September 17, 2014, with witnesses Sergeant Danel Griffin, Jr, with the Calcasieu Parish Sheriff's Office, and Captain Price. The hearing was then held open, and the second part was conducted on March 31, 2016, with witnesses Sergeant Hotard and Detective McDowell. Further, by the time the second part of the motion to suppress hearing was held, all of the attorneys for both the State and defense for the first part of the hearing had been replaced with different counsel.
The testimony adduced at the motion to suppress hearing shows the following events. On May 8, 2012, the defendant, who was in Lake Charles, went to the Calcasieu Parish Sheriff's Office because of an outstanding second degree murder warrant for his arrest. Sergeant Griffin, who worked the warrants and fugitive recovery unit of the Sheriff's Office, testified that he Mirandized the defendant and placed him in the warrants office (or warrant room). The defendant did not ask for an attorney. He waited with the defendant until the detectives from St. Tammany Parish arrived. The defendant was then brought to an interview room, and while the detectives spoke to the defendant, Sergeant Griffin remained in the interview room to provide security.
Captain Price testified the defendant turned himself in at the Calcasieu Parish Sheriff's Office. He and Sergeant Griffin brought the defendant to the warrants division. According to Captain Price, he heard Sergeant Griffin Mirandize the defendant. Subsequently, the detectives from St. Tammany Parish arrived. At one point when the defendant was in the warrant room, Captain Price heard the defendant say that he had an attorney.
Sergeant Hotard testified that when he made contact with the defendant at the Calcasieu Parish Sheriff's Office, the defendant told him he had an attorney and did not want to talk to anyone. Sergeant Hotard obliged the defendant and he was placed in a warrant room, which was in effect, an office. Sergeant Hotard noted there was another Calcasieu Parish Sheriff's Office official there to do booking paperwork. The defendant had to be booked *797 into jail in Calcasieu Parish as a fugitive on a fugitive warrant so that he could then be properly transported back to St. Tammany Parish. Sergeant Hotard left the room to contact his superior; he left the defendant in the room with Detective McDowell. When Sergeant Hotard returned to the room, Detective McDowell, in front of the defendant, told Sergeant Hotard that the defendant began speaking to him (Detective McDowell), that the defendant had said he was upset with his attorney, and that at this point he wanted to talk. Before being interviewed, the detectives went outside with the defendant so he could smoke a cigarette. Neither detective asked the defendant about the case. They then took the defendant to an interview room and Mirandized him again. The defendant signed the waiver form and gave a recorded interview. During this time, the defendant never asked for an attorney. The detectives terminated the interview when the defendant said he did not want to talk anymore. The detectives then left and, according to Sergeant Hotard, they returned to the Calcasieu Parish Sheriff's Office the following morning because they were informed the defendant had made a statement to Lieutenant Boyd Price of the Sheriff's Office, and they wanted to talk to the defendant about what he told Lieutenant Price. When Sergeant Hotard and Detective McDowell arrived, the defendant told them he was not going to talk to them, and that he had an attorney. Accordingly, they did not talk to the defendant.
Detective McDowell testified that he was in the warrant room ("warrants division room") with the defendant and Sergeant Griffin, where the defendant was undergoing the booking process. Sergeant Hotard was out of the room, making contact with their St. Tammany Office. Detective McDowell testified that he had not been aware that the defendant had told Sergeant Hotard that he had an attorney. According to Detective McDowell, he was in that room with the defendant because Sergeant Griffin had been the only other officer in the room. It was near the end of the booking process when the defendant began to speak to Detective McDowell. According to Detective McDowell, the defendant spoke to him about family members who were in Lake Charles. They never discussed anything about the investigation. According to Detective McDowell, after he spoke about his family, the defendant then "basically said he wanted to cancel his attorney and wanted to talk." Detective McDowell testified, "I basically asked him, 'Are you sure you want to talk to us?' And he said yes." Sergeant Hotard returned to the room shortly thereafter, and Detective McDowell told the sergeant what the defendant had just told him. The defendant heard what Detective McDowell told Sergeant Hotard about the defendant waiving his attorney and, according to the detective, the defendant "seemed very cooperative at that time," and "it appeared that he wanted to talk to us." Before the interview, the defendant went outside to smoke a cigarette. The defendant was then brought to an interview room, Mirandized again, and interviewed.
In denying the motion to suppress the statement, the trial court ruled as following:
I had taken that under advisement on March 31st and was provided with I think it's a total of seven disks along with the associated Boykin forms which had been introduced into evidence at the prior hearing date. There were two prior hearing dates. One was September 17, 2014 and the other was the March 31, 2016 dates.
Mr. Linder: You mentioned Boykin forms?
*798 The court: I'm sorry, Miranda forms. My error, I misspoke. That's not what I meant to say. I don't know why I said Boykin forms. It's the Miranda forms that were associated with each of those two interviews. One occurred on May 2, 2012 and the other one was on the, or simultaneously with the arrest of Mr. Jefferson on May 8th of 2012.
I had the opportunity and watched all of the videos related to the May 2, 2012 statements. I had some technical difficulties with the May 8th recordings and asked for both the defense counsel and the State to assist me and we had that conference to help me review the audio video recordings from the 8th.
Of important note in reviewing the history and the testimony of the witnesses in the motion to suppress I was of particular interest to see Mr. Jefferson's demeanor when he was again placed under video audio surveillance and provided with this Miranda form to try to make some sense of the inconsistencies in the testimonies. Although there were several inconsistencies about when Mr. Jefferson invoked his right to counsel, it was undisputed that he did invoke his right to counsel. The question in my mind was what then prompted the May 8th statement and who initiated the initial contact to them for him to give them that statement and was it knowingly and voluntarily made knowingly, knowing that he was intelligently waiving his right to counsel after he had in fact invoked his right to counsel.
It was, I believe, Officer McDowell, who had indicated through the process of Mr. Jefferson being booked that after having some small talk, more likely relevant to Mr. Jefferson's family, both here in St. Tammany and down in the Calcasieu Parish area, then Mr. Jefferson according to Mr. McDowell made a comment to the effect that he wanted to cancel his attorney and wished to talk to the officers.
Without being 100 percent sure of exactly what was said and when it was said, in looking at the totality of the circumstances and again I look back at the demeanor of Mr. Jefferson when he is placed under audio and video surveillance to see if he appeared to be under any form of duress, coercions as an attempt to get him to make a statement and I don't note any in that recording, It looks like he is fairly comfortable.
He had already been provided that Miranda form once before. He acknowledged that he understood it was the same form. The officers went through it with him. He again initiated or signed it both acknowledging his familiarity with the forms as well as the waiver of the form and then proceeded to give a statement. And I did not look to the entirety of the statement.
Basically after the point of the reading of the Miranda form to him and his acknowledgment and waiver of same, I discontinued watching the tape at that point because that was the relevant issue at that point was did he truly, knowingly waive his right to counsel and did the State in any way violate his right to counsel by continuing to initiate communication with him with any intent to coerce a confession from him.
With all that said the Court finds that the statement was freely and knowingly made. The State did not violate his right to counsel and the Court going to deny the motion to suppress.
When a court denies a motion to suppress, factual and credibility determinations should not be reversed in the absence of a clear abuse of the court's discretion, i.e., unless such ruling is not supported by the evidence. See *799 State v. Green, 94-0887 (La. 5/22/95), 655 So.2d 272, 280-81. However, a court's legal findings are subject to a de novo standard of review. See State v. Hunt, 09-1589 (La. 12/1/09), 25 So.3d 746, 751. In determining whether the ruling on defendant's motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence given at the trial of the case. State v. Chopin, 372 So.2d 1222, 1223 n.2 (La. 1979).
In Miranda v. Arizona, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Supreme Court found that if a suspect indicates "in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." Edwards v. Arizona, 451 U.S. 477, 481-85, 101 S.Ct. 1880, 1883-85, 68 L.Ed.2d 378 (1981), reconfirmed these views and, to lend them substance, held that when an accused either before or during interrogation asks for counsel, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated, custodial interrogation, even if he has been advised of his rights. The accused is not subject to further interrogation by the authorities until counsel is present, unless the accused himself initiates further communication, exchanges, or conversations with the police. Edwards, 451 U.S. at 484-85, 101 S.Ct. at 1885 ; see Maryland v. Shatzer, 559 U.S. 98, 103-05, 130 S.Ct. 1213, 1219, 175 L.Ed.2d 1045 (2010). State v. Winfrey, 12-0940 (La.App. 1 Cir. 2/15/13), 2013 WL 595671 at *5 (unpublished), writ denied, 13-0585 (La. 10/4/13), 122 So.3d 1014.
When a defendant invokes his Miranda right to counsel, the admissibility of his subsequent confessions under federal law is to be determined by a two-step analysis: it first must be asked whether the defendant "initiated" further conversation; and if the answer is yes, it must be inquired whether the defendant waived his right to counsel and to silence, that is, whether the purported waiver was knowing and intelligent under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities. State v. Abadie, 612 So.2d 1, 5 (La.), cert. denied, 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993). Winfrey, 2013 WL 595671 at *5.
The Sixth Amendment right to counsel does not attach prior to the initiation of adversary judicial criminal proceedings - whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. State v. Carter, 94-2859 (La. 11/27/95), 664 So.2d 367, 372. Further, the right to counsel exists only during those post-attachment, pretrial confrontations which can be considered "critical stages." A critical stage has been described as a critical pretrial confrontation where the results might well settle the accused's fate and reduce the trial to a mere formality. It has also been described as a pretrial proceeding where the accused is confronted, just as at trial, by the procedural system, or by his expert adversary, or by both. Carter, 664 So.2d at 373. The right to counsel under Louisiana Constitution, Article I, § 13 and the right to counsel under the Sixth Amendment are coextensive in scope, operation, and application. Carter, 664 So.2d at 382 ; Winfrey, 2013 WL 595671 at *5.
Our precedents place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent. The defendant may waive the right whether or not he is already represented by counsel; the decision to. waive need not itself be *800 counseled. Michigan v. Harvey, 494 U.S. 344, 352-353, 110 S.Ct. 1176, 1182-83, 108 L.Ed.2d 293 (1990). See Montejo v. Louisiana, 556 U.S. 778, 786, 129 S.Ct. 2079, 2085, 173 L.Ed.2d 955 (2009).
Under the once bright-line, prophylactic rule of Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), overruled, Montejo, 556 U.S. at 797, 129 S.Ct. at 2091, once a defendant's right to counsel had attached, if he made an assertion or invocation of this right, any waiver he would later make in response to police-initiated interrogation would be considered invalid, regardless of whether the waiver would normally meet the standards of a knowing, intelligent and voluntary waiver. See Carter, 664 So.2d at 383. As noted, however, Michigan v. Jackson has been overruled. See Winfrey, 2013 WL 595671 at *6.
Although a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will. To hold that a defendant is inherently incapable of relinquishing his right to counsel once it is invoked would be "to imprison a man in his privileges and call it the Constitution." Adams v. United States ex rel. McCann, 317 U.S. 269, 280, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942). See Carter, 664 So.2d at 378.
Based on the foregoing, we see no reason to disturb the trial court's denial of the motion to suppress the defendant's statement. The defendant indicated to Sergeant Hotard that he had an attorney and, accordingly, Sergeant Hotard did not question the defendant. The defendant was placed in a room with Detective McDowell for about five minutes without the presence of Sergeant Hotard. While Detective McDowell was initially unaware the defendant had told Sergeant Hotard he had an attorney, Detective McDowell never spoke to the defendant or questioned him in any way about his case. According to Detective McDowell, the defendant initiated the conversation and spoke to him about the defendant's family in the area. The defendant then specifically informed Detective McDowell that he wanted to "cancel" his attorney and that he wanted to talk to the detectives. Detective McDowell then obtained an assurance from the defendant that talking to them was what he wanted to do.
Herein, the defendant exercised his right to an attorney. This right was honored and no police officer spoke to the defendant or questioned him about the case. Afterward, the defendant, under his own volition, initiated contact with the police and specifically made it known that he wanted to talk to the police and that he no longer wanted an attorney. Under the totality of the circumstances, the defendant voluntarily, knowingly, and intelligently waived his right to counsel (and silence) and, as such, the trial court did not err or abuse its discretion in denying the motion to suppress the statement. See State v. Tilley, 99-0569 (La. 7/6/00), 767 So.2d 6, 11-12, cert. denied, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001). See also State v. Hobley, 98-2460 (La. 12/15/99), 752 So.2d 771, 787-89, cert. denied, 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000) ; State v. Reynolds, 45,674 (La.App. 2 Cir. 11/3/10), 55 So.3d 136, 140-42 ; State v. Williams, 42,312 (La.App. 2 Cir. 8/15/07), 965 So.2d 541, 556-59, writ denied, 07-2158 (La. 4/18/08), 978 So.2d 347 ; State v. Carr, 530 So.2d 579, 586-89 (La.App. 1 Cir.), writ denied, 533 So.2d 354 (La. 1988), cert. denied, 489 U.S. 1098, 109 S.Ct. 1573, 103 L.Ed.2d 939 (1989).
The assignment of error is without merit.
*801 CONCLUSION
For the foregoing reasons, we affirm the defendant's conviction and sentence.
AFFIRMED.

The defendant states in brief that he withdrew his not guilty plea and entered a guilty plea after opening statements, but before any witnesses were sworn; however, we note that ten witnesses testified at trial before the defendant sought to change his not guilty plea. In his opening statement, the prosecutor informed the jury the State anticipated calling between thirty and forty witnesses.